IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WILLIAM R. GLASS,

             Plaintiff,

      v.

ARTHUR S. SNELLBAKER and the
CITY OF ATLANTIC CITY,

             Defendants.

Civil Action
No. 05-1971 (JBS)

**OPINION**

**APPEARANCES:**

A. Michael Barker, Esq.
BARKER & SCOTT, PC
Linwood Greene
210 New Road
Suite 12
Linwood, NJ 08221

    - and -

Michelle J. Douglass, Esq.
1201 New Road
Suite 335
Linwood, NJ 08221
    Attorneys for Plaintiff

Salvatore Perillo, Esq.
PERSKIE, NEHMAD & PERILLO
P.O. Box 730
Somers Point, NJ 08244
    Attorney for Defendant Arthur Snellbaker

Karen M. Williams, Esq.
JASINSKI & WILLIAMS, PC
1125 Atlantic Avenue
Suite 518
Atlantic City, NJ 08401
    Attorney for Defendant City of Atlantic City

**SIMANDLE, District Judge:**

**I.   INTRODUCTION**

This matter comes before the Court on motions for summary judgment by Defendants Arthur Snellbaker ("Snellbaker") [Docket Item 22] and City of Atlantic City ("Atlantic City") [Docket Item 28].  The issues to be decided arise from the claims of Plaintiff William Glass ("Plaintiff"), that he suffered retaliation in his employment as Deputy Chief of Police in Atlantic City due to his participation in protected police union activities, in violation of his associational rights under the First Amendment and New Jersey law.  For the reasons explained below, the Court shall grant Snellbaker's motion in part and deny it in part and shall deny Atlantic City's motion.

**II.  BACKGROUND**

This dispute arises out of the employment relationship between Plaintiff, who was a Deputy Chief in the Atlantic City Police Department ("the Police Department" or "ACPD"), and Defendants, Arthur Snellbaker, the former Chief of the Police Department, and the City of Atlantic City, the municipal employer.  Plaintiff alleges, among other things, that in retaliation for associational activities protected by the First Amendment, Defendants transferred him from his job as Deputy Chief of the Special Operations Division to a Deputy Chief position in the Support Services Division of the Police

2

Department and stripped him of all job responsibilities and ability to participate in the work of the Department.

This dispute allegedly arose out of comments Plaintiff made to union members within the police department, subordinates of his and the Chief's, about his displeasure with Defendant Snellbaker.  In March 2003 Plaintiff was in charge of a drug sting operation called "Restore Hope," which resulted in the largest drug bust in Atlantic City's history.  Defendant Snellbaker did not attend a briefing on the operation before the bust, nor did he attend the press conference afterwards. Plaintiff commented to ACPD Safety Director Flipping and others that Defendant Snellbaker should have attended those events.

Also in March 2003, an Atlantic City Police Officer who was assigned to the Special Operations Division, Plaintiff's Division, was found dead in a supermarket parking lot in Somers Point, New Jersey.  Plaintiff contends that Defendant Snellbaker failed to appear at the scene during the investigation of the officer's death or at the officer's funeral.  These failures upset the police officers in the Special Operations Division.  To avoid "a worsening morale problem in the Special Operations Division" that could have "increase[d] the risk of deleterious or ineffective law enforcement action," Plaintiff told those officers that Chief Snellbaker's conduct was inappropriate. (Compl. ¶¶ 20-21).  Plaintiff claims that he made these comments

3

to support the officers who were organizing a protest of Chief Snellbaker's conduct through the Policemen's Benevolent Association of Atlantic City ("PBA" or "the union").

Although Plaintiff, as a supervisor, was not represented by the PBA in contract negotiations, he was a dues-paying member of the union.  In the Spring of 2003, the union shop steward and union president approached him and told him that the union wanted to have a "no confidence" vote against Chief Snellbaker for these and other failings, including allegedly racist and sexist comments by the Chief that damaged his relationship with the officers.  During two to five conversations with PBA union members and officers, Plaintiff criticized Snellbaker but convinced the union to hold an open meeting to air their grievances instead of a confidence vote.  Chief Snellbaker was invited to and spoke at that meeting.  Plaintiff did not attend it.

According to his deposition testimony, Plaintiff listened to officers under his command speak about their displeasure with the Chief on numerous occasions, outside of the union activity, to make sure they knew Plaintiff supported them and to try to alleviate their distractions from the dangerous work in which they were engaged.  (Glass Dep. at 85-88 in Pl.'s Ex. C.)  But Plaintiff denies joining in their criticisms, outside of the union activity described above.  (Id. at 88).  Plaintiff

4

admitted, however, that he had conversations with Captain Abrams, who was also a subordinate of Snellbaker's, in which Plaintiff expressed his concerns about Chief Snellbaker.  (Id. at 88-89).

In Plaintiff's words, he believes that Chief Snellbaker reassigned him from a career path he had been on for 23 years, dealing with the most dangerous and high profile police operations, to a position that was largely administrative and "meaningless" to Plaintiff because he was not given any authority or responsibility in that role, in retaliation for Plaintiff's "union activity" including "recommending that the union call the Chief and ask him to explain his actions." (Glass Dep. at 90-91).  In addition, Plaintiff "supported the union, as a union member, in their right to ask the Chief to explain himself." (Id. at 105).

Defendants argue that (1) the First Amendment does not protect Plaintiff because he was a supervisor who was not represented by the union; (2) he was not genuinely engaged in union activity, but rather was performing a job function and attempting to thwart a union protest; and (3) Plaintiff did not criticize Chief Snellbaker in his role as a citizen and was not speaking on matters of public concern.  Further, Defendants argue that even if Plaintiff was engaging in protected conduct, his employment-related claims, under the First Amendment and New Jersey common law, would fail because Defendants did not

5

retaliate against him; and his claims for defamation would fail because the alleged defamatory statements are non-actionable statements of opinion.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).  The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party would have the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Country Floors v. P'ship of Gepner and Ford, 930 F.2d 1056, 1061-63 (3d Cir. 1991).  "The burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

"[T]he nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered."  U.S. v. Premises Known as 717 S. Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e))(citations omitted).

> Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery
> and upon motion, against a party who fails to
> make a showing sufficient to establish the
> existence of an element essential to that
> party's case, and on which that party will
> bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as
> to any material fact," since a complete
> failure of proof concerning an essential

element of the nonmoving party's case
necessarily renders all other facts
immaterial.

Celotex, 477 U.S. at 323.

## IV.  DISCUSSION

Because Defendants' motions for summary judgment overlap,
the Court will analyze them together for the sake of efficiency
and will organize the discussion according to which of
Plaintiff's claims is at issue.

### A.    Plaintiff's First Amendment Claims

In Count One of his Complaint, Plaintiff alleges that
Defendants retaliated against him for "speech or activity
protected by the First Amendment."  (Compl. ¶ 51).  Defendants
argue that Plaintiff's speech and conduct were not protected by
the First Amendment because they were made not as a citizen but
in his role as a Deputy Chief, attempting to maintain the focus
and morale of his subordinate officers.

To state a claim for First Amendment retaliation, an
employee must demonstrate that (1) the employee's speech was
protected and (2) that the employee's speech was a motivating
factor in the alleged retaliatory action.  Green v. Phila.
Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997).  The first
question is a question of law, the second a question of fact.
Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).
The First Amendment protects a public employee's statements when

"(1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) his employer did not have 'an adequate justification for treating him differently from any other member of the general public' as a result of the statement." Muzslay v. City of Ocean City, 2007 U.S. App. LEXIS 7311, *7 (3d Cir. 2007)(quoting Hill, 455 F.3d at 241-42).

The First Amendment, however, does not protect employees from discipline based on speech made pursuant to their official job duties. Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006). This is because "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960. Therefore, to the extent Plaintiff alleges that Defendants unconstitutionally disciplined him for statements he made to his officers to boost their morale, that allegation is not actionable.

On the other hand, Plaintiff makes additional allegations that he was disciplined for his speech and conduct in connection with union action by the PBA, of which he was a member.[1] Plaintiff argues that the retaliation violated his First Amendment right to associate with a union.

---

[1] Although Defendants dispute whether he was a member who was actually represented by the union, the Court must view the facts in the light most favorable to Plaintiff on this motion.

9

> Although the Constitution undoubtedly
> protects freedom of association as a right
> supportive of the exercise of other rights,
> see Griswold v. Connecticut, 381 U.S. 479
> (1965), the right to associate, even for
> legitimate ends, has never been held to be
> absolute. See United States Civil Service
> Commission v. National Association of Letter
> Carriers, AFL-CIO, 413 U.S. 548 (1973).

United States v. Local 560 (I.B.T.), 974 F.2d 315, 345 (3d Cir.

1992).

   The right to associate, whether with a union or other

organization, is protected by the First Amendment.

> We have recognized a First Amendment right to
> associate for the purpose of speaking, which
> we have termed a "right of expressive
> association." See, e.g., BSA v. Dale, 530
> U.S. 640, 644 (2000). The reason we have
> extended First Amendment protection in this
> way is clear: The right to speak is often
> exercised most effectively by combining one's
> voice with the voices of others. See Roberts
> v. United States Jaycees, 468 U.S. 609, 622
> (1984). If the government were free to
> restrict individuals' ability to join
> together and speak, it could essentially
> silence views that the First Amendment is
> intended to protect. [Id.]
>
> [W]e have held laws unconstitutional that
> require disclosure of membership lists for
> groups seeking anonymity, Brown v. Socialist
> Workers '74 Campaign Comm., 459 U.S. 87,
> 101-102 (1982), or impose penalties or
> withhold benefits based on membership in a
> disfavored group, Healy v. James, 408 U.S.
> 169, 180-184 (1972). Although these laws did
> not directly interfere with an organization's
> composition, they made group membership less
> attractive, raising the same First Amendment

concerns about affecting the group's ability
to express its message.

Rumsfeld v. Forum for Academic & Inst'l Rights, Inc., 547 U.S.

47, __, 126 S. Ct. 1297, 1311-12 (2006).  Further, nothing in the

Garcetti case casts doubt upon the First Amendment associational

protections of public employees expressing themselves through

lawful union activities, such as meetings and grievances.

In this case, there is a material issue of fact whether

Defendant transferred Plaintiff to his no-work job because of

Plaintiff's association with the PBA and the PBA's criticism of

the Chief as well as the actions they took to petition their

public employer for change.

> Among the rights protected by the First
> Amendment is the right of individuals to
> associate to further their personal beliefs.
> While the freedom of association is not
> explicitly set out in the Amendment, it has
> long been held to be implicit in the freedoms
> of speech, assembly, and petition. See, e.g.,
> Baird v. State Bar of Arizona, 401 U.S. 1, 6
> (1971); NAACP v. Button, 371 U.S. 415, 430
> (1963); Louisiana ex rel. Gremillion v.
> NAACP, 366 U.S. 293, 296 (1961); NAACP v.
> Alabama ex rel. Patterson, 357 U.S. 449
> (1958) (Harlan, J., for a unanimous Court).

Healy v. James, 408 U.S. 169, 181 (1972).  Plaintiff's

conversations with union officials, in connection with their

attempts to petition for change and talk with one another as well

as the Chief about avenues for change, is protected conduct under

the First Amendment.  In his conversations with the union,

Plaintiff was not acting pursuant to his official duties to the

11

Department, but as an associate of the union; this is so whether

his status was as an official member as he contends or whether he

was merely an affiliate who received lesser benefits, as

Defendants contend.

> The First Amendment grants all citizens,
> including public employees, the right to
> freely associate with others without fear of
> retaliation. U.S. const. amend. I; Smith v.
> Ark. State Highway Employees, Local 1315, 441
> U.S. 463, 465 (1979) (per curiam) ("The
> public employee surely can associate ...
> freely ..., and he is protected by the First
> Amendment from retaliation for doing so.")
> This right extends to union-related activity.
> "Plainly efforts of public employees to
> associate together for the purpose of
> collective bargaining involve associational
> interests which the first amendment protects
> from hostile state action." Labov v. Lalley,
> 809 F.2d 220, 222-23 (3d Cir. 1987). See also
> [Suppan v. Dadonna, 203 F.3d [228,] 230-31,
> 236 [(3d Cir. 2000)] (recognizing that First
> Amendment forbids government from retaliating
> against public employees for engaging in
> collective bargaining); Robb v. City of
> Philadelphia, 733 F.2d 286, 295 (3d Cir.
> 1984) (holding allegation that defendants
> retaliated against plaintiff for
> "exercis[ing] his rights of association
> through participation in his labor union ...
> sets forth the bare bones of a claim for
> which relief may be granted"); McGrogan v.
> SEPTA, 2002 U.S. Dist. LEXIS 13067, No.
> 01-1342, 2002 WL 1586979, at *2 (E.D. Pa.
> July 19, 2002) (acknowledging that
> retaliation against public employee for
> participating in union election is forbidden
> by First Amendment). To state a claim under §
> 1983, plaintiffs must allege instances of
> union activity for which they were retaliated

> against by persons acting under color of
> state law.

Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 544 (D.N.J.

2003), aff'd, 145 Fed. Appx. 763 (3d Cir. 2005).[2]

Having found that Plaintiff's speech and conduct with the

union are protected by the First Amendment right of association,

the Court must now determine whether Plaintiff has proffered

admissible evidence that his association with the union was a

substantial or motivating factor in retaliatory action that

Defendants took against him.  Plaintiff has presented sufficient

evidence from which a reasonable jury could determine that

Defendant Snellbaker transferred him to the Support Services

Division and eliminated all his job responsibilities in

retaliation for Plaintiff's support of the union's challenges to

Snellbaker about his conduct.  Plaintiff has presented evidence

that he was involved in convincing union officials to hold an

open meeting in which Snellbaker would answer the union members'

questions and that he agreed with their decision to go that route

---

[2]  The Court of Appeals for the Third Circuit has not
decided whether the burdened association must also touch on
matters of public concern.  When a public employee's organization
performs some activities that are of public concern and some that
are not, it appears that if an employer burdens or punishes the
right to associate with the organization, then the employer also
incidentally burdens protected rights, regardless of whether the
particular conduct that made the employer aware of the punished
employee's association constitutes speech for First Amendment
purposes.  In other words, if the association is protected as
incidental to other First Amendment rights, it should not matter
that some of the organization's conduct is not protected speech.

(DiGiovanni Aff. at ¶ 11); that Chief Snellbaker was angry about
the union meeting, that the meeting got heated and "emotions were
at an all-time high" (McCausland Dep. at 22 in Pl.'s Ex. E); that
before the meeting Snellbaker indicated that Plaintiff was doing
his job very well (Glass Dep. at 105-06 in Pl.'s Ex. C); and that
"a very short period of time" after the meeting Plaintiff got
"spanked" "zinged" and "hammered" by Chief Snellbaker for his
involvement with that union activity, that is, he was "iced" by a
transfer to a "do-nothing" job in the services division where
according to "common knowledge" the Chief put people "that he
didn't like or didn't think much of." (Leichtman Dep. at 7, 35,
38, 32-33, 29.)  According to one officer in that division,
Leichtman, Chief Snellbaker took over the responsibilities that
fell within Plaintiff's job description because "everybody knew
[t]hat Snellbaker wasn't going to give D[eputy] C[hief] Glass
anything to do or any input on anything."  (Leichtman Dep. at 23
in Pl's Ex. G.)  Officer Leichtman also testified that the
officers understood Glass's transfer as retaliation for his
union-related conduct.  He said, "Snellbaker was very angry at
Glass" because "Glass had evidently talked to the union, and
Snellbaker had to go talk to the union."  (Id. at 23.)

     In addition, former Director of Public Safety, Robert
Flipping, testified that when Snellbaker received the letter from
the PBA requesting that he attend a meeting to address their

concerns, Snellbaker stormed into Flipping's office waving the
letter, blaming Plaintiff and vowing to retaliate against him:

> So he came into the office with his letter,
> and he says I'm transferring Glass, and I
> said okay.  Why.  He says I'm not going to
> have a deputy chief of mine talking behind my
> back.  So I said whoa.  I said what did he
> say.  He said I'm not going into it, I'm not
> having it.  I said, well, Art, Willie's whole
> career has been operations.  We don't even
> have anybody who is as qualified as Willie to
> take over the tac[tical] team.  Why don't you
> think about this.
> I'm not thinking about it.  I'm
> transferring him.

(Flipping Dep. at 25-26 in Pl.'s Ex. A.)

Flipping's account is corroborated by the testimony of
others.  Ronald DiGiovanni, who was the Vice President of the
union at the time, attested that "[s]hortly after Chief
Snellbaker received the letter from the union asking him to
attend the union meeting, Deputy Chief Glass was transferred from
Special Operations as well as SWAT (Swat team, Vice, etc.) to
Support Services (Administrative).  It was rumored that the
transfer of Deputy Chief Glass was a result of the union
meeting."  (DiGiovanni Aff. at ¶ 14 in Pl.'s Ex. I.)

Retired Police Captain Michelle Polk, who worked in the
division to which Snellbaker transferred Plaintiff, has said that
Plaintiff's job was a do-nothing job, intended to punish him.
She attested that shortly after the union meeting Chief

15

Snellbaker "abruptly" transferred Glass to the Support Services division where,

> Chief Snellbaker froze out and by-passed
> Deputy Chief Glass as though he was no longer
> an executive officer, or even part of the
> department.  Snellbaker consistently
> contacted and e-mailed Captains within this
> Division with various assignments, completely
> by-passing Deputy Chief Glass without even a
> copy e-mail. . . . It was apparent to all
> that Deputy Chief Glass was being punished
> for involvement with the union meeting.

(Polk Aff. at ¶ 8 in Pl.'s Ex. P.)

Furthermore, when Defendant Snellbaker made his decision to transfer Plaintiff, Flipping resisted and Snellbaker failed to provide legitimate reasons for the transfer.  In a memorandum to Snellbaker memorializing his advice, with copies to the City Solicitor, Mayor and Business Administrator, Flipping noted:

> I spoke to you personally on Tuesday 4/15/03
> and again on Wednesday 4/16/03 in reference
> to your sudden decision to transfer three of
> your four Deputy Chiefs to different
> divisions.  I informed you to put in writing
> your reasons, justifications, and plans that
> would justify such a monumental and
> strategically impacting circumstance on the
> department and to have that on my desk before
> you left duty yesterday . . . you did not
> comply.

(Flipping Mem. April 17, 2003 in Pl.'s Ex. K.)  Therefore, Flipping attempted to temporarily postpone the transfers. Flipping wrote another memorandum on April 21, 2003, and asked the Chief to sign it to acknowledge he had received it, which he did.  (Flipping Mem. April 21, 2003 in Pl.'s Ex. L.)  The crux of

16

that memorandum was the same but included an admonition that
these transfers were not part of the Chief's duties over "day to
day operations" and might subject him to disciplinary charges if
he did not provide justifications for them.  (Id.)  Snellbaker
responded that he felt the Director's postponement was "invalid."
(Snellbaker Ltr. April 21, 2003 in Pl.'s Ex. M.)  The only
justification he provided for the transfers was that he had "lost
confidence in one of" the deputies.  (Id.)

     Another memorandum from Flipping the next day memorializes
additional conversations between the parties.  (Flipping Mem.
April 22, 2003 in Pl's Ex. O.)  That document indicates that
Snellbaker transferred Plaintiff in retaliation for "badmouthing"
him, but does not indicate whether that occurred in the context
of the union activity that greatly angered Snellbaker.  (Id.)[3]

          You did state to me that you didn't have
          confidence in one of your deputies.  More
          specifically you stated to me that you had

_____

          [3]  There is sufficient evidence from which a jury could
infer the meeting angered Snellbaker sufficiently to cause him to
retaliate against Plaintiff for encouraging it.  Then-Deputy
Chief Ernest Jubilee was at the union meeting and observed that
"Although Chief Snellbaker replied to questions posed to him at
the meeting by officers, it seemed to me that he was not happy
about being called to a union meeting to answer questions about
his conduct before the rank and file."  (Jubilee Aff. at ¶ 4 in
Pl.'s Ex. Q).  Jubilee and former Deputy Chief Henry White also
stated that Plaintiff conducted himself in a "quasi-militaristic"
fashion and never publicly criticized superior officers.  (Id. at
¶ 6, White Aff. at ¶7 in Pl.'s Ex. R).  A reasonable jury could
find, then, that the "badmouthing" for which Plaintiff was
punished could only be the statements he made in connection with
union activity.

> "heard" that Chief Glass was engaged in
> badmouthing you with the line personnel. . .
> .  As you well know, we do not change
> assignments for disciplinary purposes and if
> you are bringing forth that allegation
> against Chief Glass then I would encourage
> you to do so through the disciplinary
> process.  As you know, Chief Glass just
> successfully completed the largest drug
> operation in the history of the City.  Your
> allegation simply flies in the face of his
> most recent success.

(Id.)  Flipping asked again for the Chief's justifications for

the transfers.  (Id.)  Flipping also indicated that the Chief

could explain why these transfers might present a law enforcement

emergency such that the postponements would not take effect.

Ultimately Snellbaker went forward with the transfers, despite

Flipping's advice and requests for justifications.  (Id.)  This

evidence is sufficient to create material issues of fact as to

whether Plaintiff's association and conversations with the union

caused the Chief to retaliate against him.

Further, the Court rejects Defendant's argument that a

transfer cannot constitute retaliation for purposes of a First

Amendment claim.  Transferring a public employee and stripping

that person of all job responsibilities, even if such action does

not involve a demotion, is actionable because it is sufficiently

detrimental to deter persons of ordinary firmness from exercising

their First Amendment rights.  See Suppan v. Dadonna, 203 F.3d

228, 235 (3d Cir. 2000).  It is also important that this

retaliation was intended to humiliate and punish Plaintiff and

18

was perceived by the members of the Police Department as
punishment for his role in organizing or supporting the union's
activities.  Thus, a reasonable jury could find that this
functional demotion, as well as the transferring away of a
successful individual from his chosen field of work, was
retaliation for his protected conduct.

Defendant Atlantic City argues that it cannot be liable for
violating Plaintiff's First Amendment rights because 42 U.S.C. §
1983, the vehicle for Plaintiff's claims, does not permit
respondeat superior liability for Snellbaker's misconduct, citing
Monell v. Dep't of Soc. Svcs., 436 U.S. 658, 694 (1978).
Plaintiff opposes, arguing that as Chief of Police, Snellbaker
had policy-making authority for the municipality and his conduct
is therefore considered the City's conduct.  The Court agrees
with Plaintiff.

"[A] local government may not be sued under § 1983 for an
injury inflicted solely by its employees or agents. Instead, it
is when execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy, inflicts the injury that
the government as an entity is responsible under § 1983."  Id.
"A 'policy-maker' is an individual with final and unreviewable
authority to make a decision."  Hernandez v. Borough of Palisades
Park Police Dep't, 58 Fed. Appx. 909, 912 (3d Cir. 2003).

19

Snellbaker was that authority for purposes of transfers in the police department, as is evident from the Director of Public Safety's inability to curtail him.

Accordingly, Plaintiff may proceed with his First Amendment claims against both Defendants and the Court will deny Defendants' motions for summary judgment as to Count One of the Complaint.[4]

### B.   Claims under New Jersey Contract and Common Law

In Count Three of his Complaint, Plaintiff alleges that Defendants' conduct violated his rights under his employment contract with the City of Atlantic City.  (Compl. ¶ 64).  In Count Four, Plaintiff alleges that his transfer without notice and an opportunity to be heard was an adverse employment action in violation of New Jersey public policy that provides him a common law right of action.  (Compl. ¶¶ 68-75).[5]

─────────────

[4]  Of course Defendant Snellbaker's statutory argument that N.J. Stat. Ann. § 40A:14-118 provides chiefs of police with authority to make all personnel decisions has no merit in answer to a First Amendment challenge; an unconstitutional practice is unlawful regardless of whether it comports with state law.  See, e.g., Huertas v. City of Camden, No. 05-5375, 2006 WL 2772033, at *6 (D.N.J. Sept. 22, 2006).

[5]  Defendant Atlantic City argues that it is entitled to summary judgment on any claim Plaintiff may have for deprivation of Fourteenth Amendment substantive due process rights to liberty or property related to the transfer.  Plaintiff does not appear to state any such claims in the Complaint and does not address that argument in its opposition to Atlantic City's motion; therefore, it is not an issue in this case.  Rather, Plaintiff appears to be arguing only that he was denied the process rights that New Jersey law, N.J. Stat. Ann. § 40A:14-118 should have

Defendants argue that because the transfer was not punitive or retaliatory in nature, it could not have abridged Plaintiff's contractual rights or the common law.  As noted above, there is more than sufficient evidence to permit a jury to find that Plaintiff's transfer was meant to and did punish him for his conduct and speech.

Further, although Plaintiff is suing under the common law, New Jersey's Conscientious Employee Protection Act ("CEPA") provides a guide for determining whether the transfer should be considered actionable retaliation.  CEPA defines retaliation as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."  N.J. Stat. Ann. § 34:19-2(e).  In Maimone v. City of Atlantic City, 188 N.J. 221 (2006), the New Jersey Supreme Court rejected an argument by these same Defendants in another case alleging retaliatory transfer, in violation of CEPA.  Defendants also argued there that the transfer did not constitute an adverse employment action because it did not accompany a demotion.  The Court disagreed and said, "even without any reduction in compensation, a withdrawal of benefits formerly provided to an employee may be found in some circumstances to constitute an adverse employment action."  Id.

---

provided him.  This seems to be an aspect of his common law claim and not a separate constitutional claim about denial of substantive or procedural due process.

at 236.  Although there was a slight reduction in the plaintiff's salary in that case, 3 percent, as well as a reduction in the availability of overtime, it appears that the New Jersey Supreme Court would likely find the annihilation of a career employee's job duties to be an adverse employment action that alters the conditions and terms of employment even when there is no reduction in salary.  See id. (citing Nardello v. Twp. of Voorhees, 377 N.J. Super. 428, 435-36 (App. Div. 2005), which found adverse employment action when plaintiff's duties were altered and reduced).  Completely changing or eliminating an employee's daily duties is "other adverse employment action taken against an employee in the terms and conditions of employment." See N.J. Stat. Ann. § 34:19-2(e).

> Besides discharges, suspensions, and demotions, which clearly affect an employer's compensation and sometimes job rank, CEPA retaliation also includes "other adverse employment action" taken against the employee's "terms and conditions of employment."  Terms and conditions of employment "refer[] to those matters which are the essence of the employment relationship," [Twp. of West Windsor v. Pub. Employment Relations Comm'n, 78 N.J. 98, 110] (1978), and include further serious intrusions into the employment relationship beyond those solely affecting compensation and rank.

Beasley v. Passaic County, 377 N.J. Super. 585, 608 (App. Div. 2005) (citations omitted).

22

Because "[g]enerally speaking, the CEPA codified the common-law cause of  action, first recognized in Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72 (1980), which protects at-will employees who have been discharged in violation of a clear mandate of public policy," Higgins v. Pascack Valley Hosp., 158 N.J. 404, 417-18 (1999), and Defendants' conduct would be retaliation as defined in CEPA, Plaintiff also has provided evidence of retaliation under the common law.  As such, Defendants' argument that the actions here do not rise to the level of retaliation must be rejected.  The Court cannot grant summary judgment on Counts Three and Four of the Complaint on that basis.

### C.   Defamation Claim Against Snellbaker

In Count Five of the Complaint, Plaintiff alleges that Defendant Snellbaker defamed him by telling others that Plaintiff is untrustworthy, thereby damaging his reputation.  Snellbaker argues that this is a statement of personal opinion that is not actionable unless it implies false underlying objective facts. Snellbaker argues that the "untrustworthy" statement implies no false underlying objective facts and therefore cannot form the basis for a defamation claim.  On the contrary, Snellbaker argues, Plaintiff's Complaint alleges that he engaged in conduct that would justify Snellbaker's opinion of Plaintiff as untrustworthy, talking with others about Snellbaker, and that,

therefore, Plaintiff cannot succeed on a defamation claim as a matter of law.  Plaintiff argues that in this case, Defendant told several people that Plaintiff was untrustworthy without stating his basis for that opinion.  Therefore, Plaintiff argues, he implied undisclosed false facts about Plaintiff, which a jury could find to be defamatory.

The Court shall grant summary judgment on this Count.  Under New Jersey law:

> Harm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false. Only if a reasonable factfinder would conclude that the statements imply reasonably specific assertions of fact will the harm be redressable.

Ward v. Zelikovsky, 136 N.J. 516, 531 (1994) (citations omitted). Viewing the facts in the light most favorable to Plaintiff, the Court concludes that Defendant told third parties Plaintiff was untrustworthy without any explanation of why he held that view. There can be no reasonable argument that such a statement implied any specific fact about Plaintiff.  Therefore, he has failed to provide any actionable theory of defamation and Defendant is entitled to summary judgment on Count Five.

### D.   Interference with Employment Relationship

In Count Six of his Complaint, Plaintiff alleges that Defendant Snellbaker's defamation of him interfered with his employment relationship with the City.  In opposition to

Snellbaker's motion for summary judgment on this Count, Plaintiff only argues that if the Court permits a claim on Count Five it should also permit this claim, but cites no law and points to nothing in the record.  Because the Court has found that Snellbaker's statement could not be defamatory, and because Plaintiff does not appear to have any other theory of how Snellbaker interfered with the employment relationship, the Court will also grant summary judgment on this Count.

## V.  CONCLUSION

For the foregoing reasons, there are material issues of fact that preclude summary judgment on Plaintiff's First Amendment and common law retaliatory discharge claims against Defendants Snellbaker and City of Atlantic City.  Therefore the Court will deny summary judgment on those claims.  However, there is no issue of material fact with regard to Plaintiff's claims of defamation or interference with an employment relationship and defendant Snellbaker is entitled to judgment as a matter of law upon those claims in Counts Five and Six .  An appropriate Order shall be entered.


 __June 14, 2007__                      __s/ Jerome B. Simandle__
Date                                    Jerome B. Simandle
                                        U.S. District Judge