IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WILLIAM R. GLASS,

             Plaintiff,

     v.

ARTHUR C. SNELLBAKER and the
CITY OF ATLANTIC CITY,

             Defendants.

Civil Action
No. 05-1971 (JBS)

**OPINION**

**APPEARANCES:**

Michelle J. Douglass, Esq.
THE DOUGLASS LAW FIRM, LLC
1601 Tilton Road
Suite 6
Northfield, NJ 08225
    Attorney for Plaintiff

Kristopher J. Facenda, Esq.
PERSKIE, NEHMAD & PERILLO
P.O. Box 730
Somers Point, NJ 08244
    Attorney for Defendant Arthur Snellbaker

Karen M. Williams, Esq.
JASINSKI & WILLIAMS, PC
1125 Atlantic Avenue
Suite 518
Atlantic City, NJ 08401
    Attorney for Defendant City of Atlantic City

**SIMANDLE, District Judge:**

CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND. . . . . . . . . . . . . . . . . . . . . 2

III.  STANDARDS . . . . . . . . . . . . . . . . . . . . . 10
      A.   Motions for Judgment as a Matter of Law . . . . . 10
      B.   Motions for New Trial.. . . . . . . . . . . . . 12
      C.   Motions for Remittitur. . . . . . . . . . . . . 13

IV.   SNELLBAKER'S MOTION. . . . . . . . . . . . . . . . 15
      A.   Liability.. . . . . . . . . . . . . . . . . . 15
      B.   Punitive Damages. . . . . . . . . . . . . . . 21

V.    PROPRIETY OF ECONOMIC DAMAGES. . . . . . . . . . . 31
      A.   Post-Resignation Damages under 42 U.S.C. § 1983 in
           Absence of Constructive Discharge Claim.. . . . . 31
      B.   Remittitur of Front Pay.. . . . . . . . . . . . 46

VI.   EFFECT OF DISMISSING COUNT TWO.. . . . . . . . . . 49

VII.  DAMAGES FOR EMOTIONAL DISTRESS . . . . . . . . . . 51

VIII. MOTION FOR STAY OF EXECUTION OF JUDGMENT AND WAIVER OF
      SUPERSEDEAS BOND.. . . . . . . . . . . . . . . . . 60
      A.   Atlantic City.. . . . . . . . . . . . . . . . 60
      B.   Snellbaker. . . . . . . . . . . . . . . . . . 60

IX.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . 62

APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . 64

## I.   INTRODUCTION

This case, alleging violation of First Amendment rights and brought pursuant to 42 U.S.C. § 1983, was tried to a verdict before a jury.  The jury found that Plaintiff William R. Glass, formerly Deputy Chief of the Atlantic City Police Department, proved that Defendants Arthur Snellbaker and the City of Atlantic City violated Glass' right to engage in protected activity and that he suffered an adverse employment action at the hands of Snellbaker and the City, and that the protected activity was a motivating factor in this adverse action.   The jury also found that Glass' retirement was involuntary as a result of Defendants' adverse employment action.  The jury found compensatory damages for emotional and mental harm in the amount of $250,000, past wage loss of $136,400, and future wage loss of $409,600, totaling $796,000 in compensatory damages.  The jury also found Defendant Snellbaker liable for punitive damages in the amount of $75,000.[1] These motions followed.

- •   Motion by Defendant Snellbaker for Judgment Notwithstanding the Verdict [Docket Item 82]
- •   Motion by Defendant Snellbaker for New Trial on Assessment and Quantum of Punitive Damages

---

[1]   The Jury Verdict Forms are reproduced and attached to this Opinion as an Appendix.  The jury provided unanimous answers to nine interrogatories regarding liability, compensatory damages and liability for punitive damages on the Jury Verdict Form (Docket Item 74), as well as an answer to a tenth interrogatory on the Supplemental Jury Verdict Form (Docket Item 76) as to amount of punitive damages.

1

- Motion by Defendant Snellbaker to Stay Execution of Judgment and for Waiver of the Requirement to Post a Supersedeas Bond
- Motion by Defendant City of Atlantic City for Judgment Notwithstanding the Verdict [Docket Item 83]
- Motion by Defendant City of Atlantic City for a New Trial or Remittitur
- Motion by Defendant City of Atlantic City ("the City" or "Atlantic City") to Waive the Supersedeas Bond Requirement.

The Court heard oral argument on June 3, 2008 and reserved decision.

For the reasons explained below, the Court shall deny the motions for judgment notwithstanding the verdict and for a new trial as to the awards of back pay and front pay; deny the motions for judgment notwithstanding the verdict and for a new trial or remittitur as to the award of punitive damages; grant the motions for remittitur as to emotional and mental harm and as to front pay; deny the motion for a new trial on account of evidence related to Plaintiff's dismissed state law claim; and grant the motions to stay execution of judgment and for waivers of the requirement to post supersedeas bonds.

## II.  BACKGROUND

When issues of low departmental morale in the Atlantic City Police Department erupted in 2003, with widespread dissatisfaction with the management style of Chief Arthur Snellbaker, the Police Benevolent Association ("PBA") enlisted the help of one of its members, Deputy Chief Will Glass.  Glass met quietly with PBA leaders and assisted them in formulating a

2

plan to invite Chief Snellbaker to attend a PBA membership meeting to attempt to clear the air, as an alternative to a no-confidence vote that would otherwise have occurred.  Glass' association with his union brought about retaliation by Chief Snellbaker against Glass extending over the next two years, which became the basis of Glass' present claim for relief under 42 U.S.C. § 1983 for violation of his First Amendment right of association.

This case arises out of the transfer of Plaintiff William Glass from a Deputy Chief position in the Special Operations Division of the Atlantic City Police Department -- overseeing the SWAT team, vice squad and tactical team -- to a Deputy Chief position in the Support Services Division, which performs financial and administrative functions.  The evidence at trial showed that Plaintiff spent twenty-nine years in a public service career, focused on the demanding, high-profile police work that the Special Operations unit performed.  He led the Special Operations Division.  The evidence also showed that he had performed his job extremely well, was liked by his fellow officers, and was uniquely qualified for that type of work. Among other things, the evidence showed that Plaintiff's unit successfully performed the largest drug bust in the history of the Atlantic City Police Department shortly before Plaintiff's transfer.  The evidence showed that Plaintiff had the training

and skills to perform well in his chosen field, Special
Operations, and no skills or training in Support Services, and
that Chief Snellbaker shunned and disparaged him until Plaintiff
involuntarily retired several years later in 2005, five years
prior to his intended retirement date in 2010.

This case has its genesis in the Spring of 2003, when rank-
and-file police officers became angry with their Police Chief,
Defendant Arthur Snellbaker, and union members began discussing
whether to take a no-confidence vote.  Plaintiff Glass was a
long-time member of the PBA union and was influential in its
affairs as the bargaining representative of the Deputy Chiefs in
their negotiations with the City of Atlantic City.  It was
uncontradicted that Glass and all the ranking officers of the
department were themselves also dues-paying members of the
association and that they enjoyed many of the privileges of PBA
membership with the rank-and-file members.  (The PBA's By-Laws
also included Deputy Chiefs as members, according to former PBA
President Sean McCausland.)  The evidence established that Glass
and all Deputy Chiefs occasionally attended PBA meetings and
participated in PBA affairs, as had Chief Snellbaker when he was
a Deputy Chief.  The Department, by longstanding practice, dealt
collectively with the Deputy Chiefs in their contractual
bargaining through the auspices of the union.  The PBA, of
course, was also the collective bargaining unit for rank-and-file

police officers.  The evidence showed that Plaintiff spoke with union leaders -- Sean McCausland and Ron DiGiovanni -- about whether to take a no-confidence vote against Chief Snellbaker and convinced them, instead, to invite Chief Snellbaker to a union meeting to hear and answer the union members' complaints.  The union extended the invitation by letter to Snellbaker to attend and speak with the membership.  (Although the PBA letter was not introduced at trial, there was no dispute that it was sent and that Snellbaker received it.)

Evidence showed that Snellbaker became enraged at the PBA's invitation.  For example, Public Safety Director Flipping testified that an outraged Snellbaker came into his office waving a letter and denouncing the union's efforts and explicitly blaming Glass for it.  Evidence also showed that Snellbaker knew Plaintiff was involved in discussions with PBA and planning the meeting and decided to punish him for it by revoking all of his duties and transferring him to a do-nothing position.  Within about a day of receiving the PBA letter, Snellbaker signed an order April 14, 2003, effective April 30, 2003, transferring Glass.  Snellbaker, meanwhile, attended the PBA meeting and engaged in a tense discussion with the membership, as discussed below, while Glass did not attend this meeting, which occurred on April 30, 2003.

Snellbaker transferred Plaintiff to become Deputy Chief of

Support Services, an administrative position for which he had no training or experience.  Although Plaintiff's salary remained the same in that position, Snellbaker refused to provide him with the equipment or information he needed to perform his job. Snellbaker ignored Glass, communicating past him, not with him, in Glass's new position, while telling others that Glass could not be trusted.  The jury found these actions to be in retaliation for Glass's exercise of associational rights in meeting and conferring with his PBA union.  Numerous trial witnesses testified to the humiliation Snellbaker inflicted on Glass in the new Deputy Chief position.  Approximately two years later, Plaintiff resigned from the Police Department.  Although Plaintiff did not explicitly plead a constructive discharge claim in the Complaint (since he was still employed when he filed his Complaint), his subsequent deposition testimony and the Final Pretrial Order itself made it clear that he was seeking damages for constructive discharge at trial.  Glass testified and the jury found that his resignation was not voluntary and that it was caused by Defendants' retaliation for Glass' exercise of associational rights.

The trial of this action took place on January 22-24 and 28-31, 2008.  At trial, Plaintiff provided evidence about his damages in the form of his testimony.  Plaintiff testified that he retired on December 31, 2005, at age 57, but would have,

6

absent Defendants' conduct, retired at age 62, that is, at the
end of 2010.  He testified that his early retirement cost him
$50,000 per year in salary, as compared with his pension; $13,000
per year for the lost use of a vehicle; and $350 per month in
lost healthcare benefits.  (Glass Tr. at 61:14 to 65:1, Ex. C to
Williams Cert.)  Altogether, therefore, Plaintiff claimed $67,200
per year in lost wages and benefits from January 1, 2006 to
December 31, 2010, which is a five year period.  (Plaintiff's
attorney, apparently performing an arithmetical error, argued to
the jury for $68,200 per year in lost wages and benefits for a
five-year period, including back pay and front pay.)

     At the close of Plaintiff's case in chief, on January 28,
2008, the City and Snellbaker made a motion pursuant to Fed. R.
Civ. P. 50 to dismiss Plaintiff's Complaint.  Specifically,
Defendants argued that they were entitled to judgment as a matter
of law on the First Amendment right of association claim in Count
One and the statutory claim in Count Two as well as the sought-
after damages for lost wages in the absence of a separate
constructive discharge claim.  (Tr. Rule 50 Hr'g, Jan. 28, 2008,
at 56:10 to 62:23, 63:18 to 67:2, Ex. B to Williams Cert.)  No
party directed the Court to any authority justifying dismissal of
the lost wages claim under 42 U.S.C. § 1983 in the absence of a
separate constructive discharge claim or otherwise indicated
relevant authority that precluded this category of damages for

7

past and future loss of wages and benefits.

The Court granted the Rule 50 motion in part and denied it in part.  In an oral opinion, the Court ordered that Defendants' motions were denied without prejudice with respect to Plaintiff's first claim (42 U.S.C. § 1983 claim for violation of right of association under the First Amendment); that Defendant Arthur Snellbaker's motion was granted by consent, dismissing Plaintiff's second claim against him (for violation of N.J. Stat. Ann. § 40A:14-147); and that the City's motion was also granted as to this second claim.  (Tr. Oral Op., Jan. 29, 2008, at Ex. H to Williams Cert.)  The Court did not address the viability of the claim for lost wages under Section 1983 and the parties indicated they had no questions about the Court's ruling.  (Id. at 26:16-18.)  Trial went forward against Defendants Snellbaker and the City of Atlantic City solely upon Plaintiff's Section 1983 claim for violation of First Amendment rights seeking economic damages of past and future lost wages and benefits, and for non-economic damages for emotional and mental harm, as well as for punitive damages against Defendant Snellbaker.

At the close of all the evidence, Defendants renewed their Rule 50 motions as to Count One only and argued that Plaintiff failed to state a claim for a First Amendment violation. Defendants did not argue that the Court should direct a verdict as to the claim for economic damages, whether for back pay or

front pay, or that the evidence failed to prove constructive discharge.  The Court denied the renewed motion as to Count One.

On January 30, 2008, the Court charged the jury without objection and the jury, after deliberation, returned a verdict for the Plaintiff against Snellbaker and the City in the amount of $796,000 ($250,000 for mental and emotional harm; $136,400 for past wages and benefits from December 31, 2005 to the date of the verdict; and $409,600 for future lost wages and benefits[2]).  The jury also decided that punitive damages should be awarded against Snellbaker.  The Jury Verdict Form for the first phase of trial is attached in the Appendix hereto.

On January 31, 2008, the trial continued only to determine the amount of punitive damages against Snellbaker.  The parties stipulated to Defendant Snellbaker's "personal resources" as follows:

> [(1)] the amount of $500,000 was received by Snellbaker in settlement of a claim with the City of Atlantic City.  The net value of this claim was $200,000.
> [(2)] The amount of $500,000 was received by Arthur Snellbaker upon his retirement from the City of Atlantic City.  The net value of this settlement was $245,000.
> [(3)] Arthur Snellbaker affirms that any moneys that he received in the settlement and buyout[, noted above,] have been spent and are not currently available.
> [(4)] Arthur Snellbaker and his wife own a

---

[2]  Plaintiff had requested only $196,000 in front pay, according to his testimony.  This discrepancy is addressed in Part V.B, infra.

> home valued at $300,000.  They each have an
> undivided interest in that marital home so
> that the value of Arthur Snellbaker's own
> interest separate from his wife's is less than
> $300,000.
> [(5)] Arthur Snellbaker receives a pension
> income payment in the amount of $8,000 per
> month for life.
> [(6)] Arthur Snellbaker has a bank account in
> the amount of $500.
> [(7)] Arthur Snellbaker owns vehicles in the
> amount of $40,000.
> [(8)]  Arthur Snellbaker has monthly expenses
> of $3,500.
> [(9)]  Arthur Snellbaker has existing debt in
> the amount of $50,000.

(Tr. Jan. 31, 2008 at 18:10 to 19:9.)  Under oath, Snellbaker
indicated that he understood the stipulations, had discussed them
with his attorney, and that they were true and correct to the
best of his knowledge.  (Id. at 19:25 to 20:8.)  Snellbaker also
indicated that there was no stipulation he would correct.  (Id.
at 20:9-11.)  These stipulations were then entered into evidence
as the only evidence in the final phase of trial concerning
quantum of punitive damages.  The Court then issued its
supplemental instructions to the jury without objection.

     The jury returned shortly thereafter with a punitive damage
award in the amount of $75,000 against Defendant Snellbaker.
These post-trial motions followed.

## III. STANDARDS

### A.   Motions for Judgment as a Matter of Law

     Fed. R. Civ. P. 50 governs motions for judgment
notwithstanding the verdict, that is, motions for judgment as a

10

matter of law.[3]  Rule 59 governs motions for new trials.

In ruling on a motion for judgment as a matter of law, pursuant to Rule 50, a district court must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to the prevailing party.  <u>Rotondo v. Keene</u>, 956 F.2d 436, 438 (3d Cir. 1992); <u>see also</u> <u>Potence v. Hazleton Area Sch. Dist.</u>, 357 F.3d 366, 370 (3d Cir. 2004).

> Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. <u>Fineman v. Armstrong World Indus., Inc.</u>, 980

---

[3]  Snellbaker actually moved for judgment notwithstanding the verdict pursuant to Fed. R. Civ. P. 59(e).  However, because Snellbaker is asking the Court not to reconsider its own decision, but to vacate the decision of a jury and enter judgment as a matter of law, Rule 50 and its attendant standard applies, not Rule 59.  As the Third Circuit has said, "the function of the motion, not the caption, dictates which Rule applies," and so the Court must apply the proper standard, even if the party incorrectly "labeled the motion a 59(e) motion." <u>Smith v. Evans</u>, 853 F.2d 155, 158 (3d Cir. 1988).  "Each motion, as the rule recognizes, has its own office. The motion for judgment cannot be granted unless, as matter of law, the opponent of the movant failed to make a case and, therefore, a verdict in movant's favor should have been directed." <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940).  In addition, "If a motion is denominated a motion for directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule."  Fed. R. Civ. P. 50(a) advisory committee's note (1991).

> F.2d 171, 190 (3d Cir. 1992), <u>cert. denied</u>,
> 122 L. Ed. 2d 677, 113 S. Ct. 1285 (1993).
> Although judgment as a matter of law should be
> granted sparingly, a scintilla of evidence is
> not enough to sustain a verdict of liability.
> <u>Walter v. Holiday Inns, Inc.</u>, 985 F.2d 1232,
> 1238 (3d Cir. 1993). "The question is not
> whether there is literally no evidence
> supporting the party against whom the motion
> is directed but whether there is evidence upon
> which the jury could properly find a verdict
> for that party." <u>Patzig v. O'Neil</u>, 577 F.2d
> 841, 846 (3d Cir. 1978) (citation omitted)
> (quotation omitted). Thus, although the court
> draws all reasonable and logical inferences in
> the nonmovant's favor, [judgment as a matter
> of law is appropriate if] it is apparent that
> the verdict is not supported by legally
> sufficient evidence.

<u>Lightning Lube v. Witco Corp.</u>, 4 F.3d 1153, 1166 (3d Cir. 1993)

(citation omitted).

**B.    Motions for New Trial**

A motion for a new trial is governed by a different standard

and the District Court has more discretion in deciding whether to

grant it.  Pursuant to Federal Rule of Civil Procedure 59(a)(1),

a new trial may be granted "for any reason for which a new trial

has heretofore been granted in an action at law in federal

court."

> Generally, a trial court should grant a motion
> for a new trial when "in the opinion of the
> trial court, the verdict is contrary to the
> great weight of the evidence, thus making a
> new trial necessary to prevent a miscarriage
> of justice." <u>Roebuck v. Drexel University</u>, 852
> F.2d 715, 736 (3d Cir. 1988) (citing 9 Charles
> Wright & Arthur Miller, <u>Federal Practice &
> Procedure</u> § 2531 at 575-76 (1971) (noting that
> the standard for granting a new trial is

substantially less demanding than that for a
judgment as a matter of law)).

A trial court is vested with wide discretion
in ruling on a motion for a new trial. 9
Wright & Miller § 2531 at 575; <u>see also</u>
<u>Lightning Lube, Inc., v. Witco Corp.</u>, 802 F.
Supp. 1180, 1185 (D.N.J. 1992). Unlike with a
motion for judgment as a matter of law, the
court is allowed to consider the credibility
of witnesses and weigh the evidence. <u>Id.</u> "The
district court's discretion, of course, is not
unbounded. Particularly where the court has
replaced its opinion for that of the jury, we
must be careful that plaintiff's right to a
jury trial is not usurped." <u>Roebuck</u>, 852 F.2d
at 735. A trial court may not grant a new
trial because it would have come to a
different conclusion than that reached by the
jury. <u>Lightning Lube</u>, 802 F. Supp. at 1186.

Several circumstances have been recognized as
general grounds for granting a new trial: "the
verdict is against the clear weight of the
evidence; damages are excessive; the trial was
unfair; and that substantial errors were made
in the admission or rejection of evidence or
the giving or refusal of instructions." <u>Id.</u>
(quoting <u>Northeast Women's Center, Inc. v.</u>
<u>McMonagle</u>, 689 F. Supp. 465 (E.D. Pa. 1988),
<u>aff'd in relevant part</u>, 868 F.2d 1342 (3d Cir.
1989)).

<u>Lyles v. Flagship Resort Dev. Corp.</u>, 371 F. Supp. 2d 597, 601-02
(D.N.J. 2005).

**C.  Motions for Remittitur**

A jury verdict which is "so grossly excessive as to shock
the judicial conscience" can be the basis for either a new trial
or remittitur.  <u>See Williams v. Martin Marietta Alumina, Inc.</u>,
817 F.2d 1030, 1038 (3d Cir. 1987).  Verdicts that shock the
judicial conscience are those that bear no rational relationship

13

to the evidence presented.  See Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 773 (3d Cir. 1987).  "It is undisputed that [a] court may not vacate or reduce the award merely because it would have granted a lesser amount of damages." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989) (emphasis in original).  Remittitur is inappropriate when a verdict is based upon passion and prejudice, since the same may have infected the decision of the jury on liability as well as damages.  Everett v. S.H. Parks and Assocs., Inc., 697 F.2d 250, 253 n.5 (8th Cir. 1983).

> The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive. Kazan v. Wolinski, 721 F.2d 911 (3d Cir.1983); Keystone Floor Products Co., Inc. v. Beattie Manufacturing Co., 432 F. Supp. 869 (E.D. Pa. 1977). Its use clearly falls within the discretion of the trial judge, whose decision cannot be disturbed by this court absent a manifest abuse of discretion.  Murray v. Fairbanks Morse, 610 F.2d 149 (3d Cir. 1979); Edynak v. Atlantic Shipping, Inc. CIE. Chambon, 562 F.2d 215 (3d Cir. 1977). The district judge is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion. Murray, 610 F.2d at 152-53.

Spence v. Bd. of Educ., 806 F.2d 1198, 1201 (3d Cir. 1986).

As this Court has said, "[A] federal court will only grant a remittitur or a trial solely on damages if it appears that the award is so large as to 'shock the conscience of the court.'

14

Moreover, 'except in those cases in which it is apparent as a matter of law that certain identifiable funds included in the verdict should not have been there should a court grant a remittitur.'" _Associated Business Tel. Sys. Corp. v. Greater Capital Corp._, 729 F. Supp. 1488, 1503 (D.N.J. 1990).

## IV.  **SNELLBAKER'S MOTION**

### A.  **Liability**

Defendant Arthur Snellbaker argues that the Court should direct a verdict in his favor or order a new trial because the evidence does not support a finding that he retaliated against Plaintiff on account of his First Amendment protected activity. Specifically, Snellbaker argues that there is no evidence from which the jury could find that Snellbaker knew of Plaintiff's meeting with union officers McCausland and DiGiovanni to discuss the no-confidence vote.  (Snellbaker Br. at 6.)  This argument is without merit.  Several witnesses testified at trial that Snellbaker knew of the activity, was angry about it, and transferred Plaintiff because of it.  Snellbaker's own deposition testimony also indicated he knew Glass had met for these purposes with the PBA officers.  Snellbaker himself failed to refute this evidence.

For example, Captain Michelle Polk, the head of personnel for the Police Department at the time, testified that she knew Glass had been involved in arranging the union meeting with Chief

Snellbaker in lieu of a vote of no confidence.

Polk testified that a letter was sent from the union to Chief Snellbaker indicating that the "membership is very upset with the way the department is going and we would like to offer you an opportunity to come to our next meeting [t]o clear the air about a lot of issues that have been boiling and churning and upsetting people." (Tr. Jan. 24, 2008 at 30:18-23.)

Director Flipping testified that Chief Snellbaker became extremely agitated when he received the letter and declared that he would take action against Plaintiff because of it.

> I became aware that the PBA had issued the chief a letter -- from the chief -- the chief came in my office with a letter in his hand very angry waving the letter. He didn't tell me then what was in the letter, but he had it in his hand, he was waving it, and he said I'm transferring Glass and it really really took me by surprise. And I said what? He says I'm transferring Glass. I said why? He said I'm not going to have a Deputy Chief of mine bad mouthing me. And I said, I asked Arthur . . . what did Will say. I heard he was bad mouthing me. And I said Arthur I said if you heard he was bad mouthing you, you and I both know Will very well, call him in if Will said it he'll probably tell you what he said. . . . I said Art please think this over. And Art stormed out of my office and that night, I believe, I wrote Art a letter articulating how he needed to think this over
> before he took action and I asked Arthur to justify to me why he was doing what he was doing.
> Q.   When Mr. Snellbaker came into your office waving the letter, what letter did you understand that to be?
> A.   I later found out from Arthur that the PBA had requested that he explain his

16

> non-appearance    at    Restore    Hope    and    his
> non-appearance    at    the    [Officer    Denninger
> suicide scene].

(Tr. Jan. 24, 2008 at 91:13 to 92:12.)   The only explanation

Snellbaker gave then, or at trial, for the transfer was that he

lost confidence in Plaintiff.   Of a dozen witnesses called by

Plaintiff or Defendant at trial, not one agreed that there was

any basis for Snellbaker to lose confidence in Glass, who was

uniformly seen as a highly competent leader of the tactical squad

that had just completed the largest narcotics operation in police

department history.   Indeed, by all accounts (Glass, McCausland,

and DiGiovanni) it was Glass who was able to defuse the PBA's

initial inclination to hold a no-confidence vote, a highly

divisive and undermining gambit, in favor of a meeting to talk

through the members' concerns about the Chief's leadership style

and departmental morale.   Not a single witness was called who

ever heard Glass disparage Snellbaker or otherwise attempt to

undermine his authority as Chief.   The jury had ample evidence

that Snellbaker's decision to transfer, shun and humiliate Glass

was the direct result of Glass's association with the union and

its efforts to air grievances with Snellbaker.   Indeed, the jury

heard from Director Flipping, as quoted above, that Snellbaker's

decision to transfer Glass was directly and immediately

manifested when Snellbaker received the PBA letter and associated

Glass with the PBA's invitation to meet.   Captain Kevin Leichtnam

17

also testified he witnessed Snellbaker acting very angry when he got the PBA's invitation to the meeting, and he heard Snellbaker tell Deputy Chief Erskine, outside Leichtnam's office, that he was transferring Glass to a "dead-end job."

Polk also testified that the union meeting to which the letter invited Snellbaker was "packed" and that she was challenging Chief Snellbaker about some of his behavior at the funeral of a fellow officer when he accused her of aligning herself with Plaintiff.  Taking an adversarial tone, Snellbaker responded to Captain Polk by mentioning Plaintiff's name out of context.  According to Polk's testimony at trial:

> [Snellbaker] prefaced one of his comments that "while I appreciate your loyalty to Deputy Chief Glass . . .," and then he answered. I don't remember which question it was but when he said it didn't really go with the question, it had nothing to do with the question that was asked of him.  And I was puzzled as what appeared to be everybody else was puzzled.
>
> Q.   You didn't mention Deputy Chief Glass's name?
>
> A.   No.

(Id. at 23:2-9.)  The jury could have inferred from this testimony that Snellbaker assumed the police officers who questioned him at the union meeting were doing so at the behest of Plaintiff.

Polk further testified that when Defendant Snellbaker "stripp[ed]" Glass of all of his responsibilities, it was her

impression, generally shared by others in the police department, that "he was being ostracized for the union activity."  (<u>Id.</u> at 27:17-18.)  Polk testified that the letter, the transfer, and the union meeting all occurred within two weeks of each other and that there appeared to be no other reason for Glass's transfer than a retaliatory motive.  Flipping and others testified Glass had spent his career training and working on one law enforcement path, involving SWAT team work and other special and tactical operations, and was abruptly transferred to an administrative position, for which he had no training.  There was ample testimony that Chief Snellbaker viewed the administrative work as insignificant and that he removed all responsibilities from Glass in his new position, talking directly to his subordinates and failing to include Glass in the work of the Support Services section he was supposed to lead.

The jury was instructed that they could not find Defendants liable unless they found that Glass had engaged in protected activity under the First Amendment right of free association and that Glass was transferred on account of his union activity.  The Jury Instructions carefully defined "Protected Activity," which was incorporated into the Jury Verdict Form in Questions 1 and 3 (see Appendix, <u>infra</u>).  The evidence indicated Snellbaker was transferring Glass because of the letter asking him to listen and respond to the union membership.  The evidence demonstrated that

19

Snellbaker viewed Glass' new position as menial, and that he intended to humiliate Glass for his union association. Snellbaker was retaliating against Glass due to Glass's exercise of rights of association protected by the First Amendment, as previously explained.

Defendants provided no other legitimate reason for the transfer.  Basically, at trial, Snellbaker indicated that he transferred Glass because he had the power to do so as Chief, while the Director of Public Safety (Flipping) and the Mayor of Atlantic City (Langford) testified that they knew Snellbaker's motives were wrong but they could do nothing to intervene at the time or over the several years as Snellbaker shunned Glass.  But, even if Defendants had come forward with neutral, non-retaliatory reasons for punishing Glass, the evidence at trial was more than sufficient to support the jury's finding that Snellbaker was specifically motivated by Glass's involvement in calling the union meeting when Snellbaker transferred him out of his respected, high profile position and removed his job duties.  The jury was free to find that Snellbaker's proffered reason – basically that he had lost confidence in Glass – was a pretext for Snellbaker's true reason, which was to punish Glass for his engaging in protected union activity.  Accordingly, the motion shall be denied.  See also (Tr. Jan. 29, 2008 at 20:8-21:1) (Rule 50 Oral Op. explaining evidence of link between union activity

20

and retaliation by Snellbaker).

**B.   Punitive Damages**

1.   <u>Parties' Arguments</u>

Defendant Snellbaker argues that there is no evidence that would satisfy the minimum standards required for awarding punitive damages: a conscious desire to violate Plaintiff's federal rights, or a reckless or callous disregard of such rights.   (Snellbaker Br. at 7.)

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983).   At trial, the jury was instructed consistent with this requirement.[4]

---

[4]   The jury instruction on whether to award punitive damages provided, in part:

> You may only award punitive damages if you find that Arthur Snellbaker acted maliciously or wantonly in violating Will Glass's federally protected rights.
> A violation is malicious if it was prompted by ill will or spite towards the plaintiff.   A defendant is malicious when he consciously desires to violate federal rights of which he is aware, or when he consciously desires to injure the plaintiff in a manner he knows to be unlawful.   A conscious desire to perform the physical acts that caused plaintiff's injury, or to fail to undertake certain acts, does not by itself establish that a defendant had a conscious desire to violate rights or injure plaintiff unlawfully.

Snellbaker also argues that the quantum of punitive damages was "clearly contrary to the weight of the evidence and the result of passion, prejudice, bias and sympathy." (Snellbaker Br. at 9.) Snellbaker's primary argument for why the verdict on the quantum of punitive damages should be set aside is that it took the jury only twenty-seven minutes to calculate it.

Snellbaker further argues that the jury should have been

---

A violation is wanton if the person committing the violation recklessly or callously disregarded the plaintiff's rights.

If you find that it is more likely than not that Defendant Snellbaker acted maliciously or wantonly in violating Will Glass's federal rights, then you may award punitive damages against Snellbaker. However, an award of punitive damages is discretionary; that is, if you find that the legal requirements for punitive damages are satisfied, then you may decide to award punitive damages, or you may decide not to award them. . . .

The purposes of punitive damages are to punish a defendant for a malicious or wanton violation of the plaintiff's federal rights, or to deter the defendant and others like the defendant from doing similar things in the future, or both. Thus, you may consider whether to award punitive damages to punish Defendant Snellbaker. You should also consider whether actual damages standing alone are sufficient to deter or prevent Defendant Snellbaker from again performing any wrongful acts he may have performed. Finally, you should consider whether an award of punitive damages in this case is likely to deter other persons from performing wrongful acts similar to those Defendant Snellbaker may have committed.

(Jury Instr. 18, Punitive Damages). All parties approved this instruction.

allowed to assess punitive damages only at 1% or less of his net

worth.[5]  No party asked for such an instruction at trial.  Now,

_____

[5]  Without objection, the Court instructed the jury on assessing the quantum of punitive damages as follows, in part:

> In deciding the amount of punitive damages to award, you must keep in mind the purposes of punitive damages.  That is, in deciding the amount of punitive damages, you should consider the degree to which Defendant Arthur Snellbaker, Sr. should be punished for his unlawful conduct toward Plaintiff in violation of Plaintiff's First Amendment right, and the degree to which an award of one sum of money or another will deter others from committing similar wrongful acts in the future.  The future deterrence of Arthur Snellbaker himself is not a reason you can use to impose punitive damages because he has retired and there is no evidence he may return to a governmental position administering personnel.
>
> You should also consider the nature of Defendant Snellbaker's conduct for which you have found him liable.  For example, you are entitled to consider whether Defendant Snellbaker acted in a deliberately deceptive manner, and whether he engaged in repeated misconduct toward William Glass, or a single act.  You should also consider the amount of harm actually caused to William Glass by Arthur Snellbaker's action, and the harm that could result if such acts are not deterred in the future.
>
> Bear in mind that your determination of the amount of punitive damages may only punish Arthur Snellbaker for harming William Glass, and not for harming any other person.
>
> The extent to which a particular amount of money will adequately punish Defendant Snellbaker, and the extent to which a particular amount will adequately deter a future misconduct, may depend upon Defendant Snellbaker's current financial resources.  Any award of punitive damages that you make in this case will constitute a judgment against,

23

however, ignoring Snellbaker's monthly income of $8,000 ($96,000 per year), defense counsel argues that Snellbaker's net worth is somewhere between $290,500 and -$9,500, and that, therefore, the punitive damage award is excessive.

As an alternative to a new trial or judgment as a matter of law, Snellbaker argues that the Court should order the remittitur of the punitive damages award because it is so excessive as to shock the conscience.  (Snellbaker Br. at 11.)  Specifically, Snellbaker requests that the Court reduce the punitive damage award to $2,500, "a figure that is arguably within the ... '1% of net worth' rule."  (Id. at 12.)  Snellbaker further urges the Court to consider that (1) he acted in good faith, seeking legal guidance as to whether the transfer was within his power and (2)

_____

and payable by, Arthur Snellbaker, Sr., in his individual capacity.  Therefore, in considering the amount of this award, you may consider the current financial resources of Arthur Snellbaker in fixing the amount of such damages.

  Remember that you are to perform this duty without sympathy, bias or prejudice either for or against any party.  Your award of punitive damages should be no greater than the amount you find necessary and sufficient to punish the wrongfulness of the conduct of Arthur Snellbaker toward William Glass in violation of Glass's First Amendment right of association, taking all these considerations into account.  In other words, your award should be adequate but not excessive.

(Supp. Jury Instr. 20, Amount of Punitive Damages) (Docket Item 77.)

24

Plaintiff never complained or filed any grievance about his transfer.  (Id. at 13.)

Plaintiff opposes, arguing that there is no 1% rule and that, even if there were, because there was evidence that Snellbaker has a guaranteed retirement income of $96,000 per year and because his life expectancy is at least another ten years, the $75,000 award is not excessive.

        2.  <u>Analysis</u>

            *(a)  Evidence was Sufficient to Show State of Mind*

There was ample testimonial and documentary evidence from which the jury could have found, applying the settled law in their instructions, that Snellbaker acted in callous disregard of Plaintiff's federally protected rights.  Accordingly, the Court shall not overturn the jury's decision to award punitive damages.

Chief Snellbaker was on notice of the wrongfulness of his conduct in retaliating against Glass.  Director Flipping and Mayor Langford testified that they both advised against punishing Glass and urged the Chief of Police to explain his conduct.  They also explained that they did not stop Snellbaker from making the transfer not because they thought the transfer was legitimate, but because they were uncertain whether they had the legal authority under state law to overturn an erroneous personnel decision of the Chief.

At no point was Snellbaker advised that his conduct was

legal.  Instead, the evidentiary record includes a series of
letters between Flipping and Snellbaker where Flipping repeatedly
advised against the transfer and asked the Chief to justify his
decision.  While, as Chief of Police, Defendant Snellbaker had
statutory authority to transfer, promote and manage the personnel
in the Atlantic City Police Department, Director Flipping
repeatedly advised Snellbaker that to use that power to retaliate
against Glass was inappropriate.

There was also evidence that Snellbaker acted with a
malicious intent in transferring Glass.  Glass testified that
Snellbaker came to a meeting with the Deputy Chiefs and announced
the transfer without explanation, left the room, and then stood
outside "belly laugh[ing]" with another Deputy Chief.  (Glass Tr.
at 44:13-25.)  Glass testified that after transferring him to
Support Services, Snellbaker "froze me out of the police
department and ostracized me and actually humiliated me every
single day."  (Id. at 45:11-13.)  Glass also testified to
specific instances of this mistreatment, including that the Chief
denied him access to the equipment and software that he needed to
perform his new job and that the Chief excluded Plaintiff Glass
from discussions relevant to his work by dealing directly with
Plaintiff's subordinates.  (Id. at 47:1-6.)  Glass's testimony
was more than confirmed by the testimony of other witnesses with
personal knowledge of Snellbaker's treatment of Glass in a

26

humiliating and demeaning fashion[6], all stemming from Glass's association with the recognized union's efforts and meetings examining Chief Snellbaker's performance and departmental morale.

That evidence and more was sufficient to show that Snellbaker acted with a state of mind sufficiently culpable to trigger liability for punitive damages.  The jury did not err in

---

[6] For example, Captain Kevin Leichtnam, who was in charge of the Budget Unit under Deputy Chief Glass, testified he observed that Snellbaker "iced out" Glass from the normal Deputy Chief duties, giving virtually nothing to Glass, so that Glass would not even know what his subordinate, Leichtnam, was doing.  He testified that Snellbaker regarded Glass as one of the "Staff Flunkies" and refused to authorize Glass for access to the AS-400 financial software process, even though Glass was supposed to be in charge of the budget process.  Leichtnam regarded Glass as a "fantastic" manager who told his subordinate captains not to let any of the difficulties with Snellbaker affect them, and he observed Glass to be embarrassed by the situation.

Deputy Chief Henry White, Jr., has also worked under Glass in the Support Services Division, working as a captain on accreditation duties.  He testified Snellbaker by-passed Glass in his dealing with White, ignoring the chain of command that had previously existed, reposing no trust in Glass.  He testified Glass did what he could do and encouraged White to do the best job he could.

Former Captain Michelle Polk, who retired in July, 2005, testified that Snellbaker treated Glass as an outcast, ostracizing him in his new duties.

Director of Public Safety Robert Flipping, III, who testified at length about Snellbaker's motives in retaliating against Glass, also testified that after Glass took up his new position in Special Services, he never saw Snellbaker actually use Glass as the Deputy Chief for that unit, instead using Leichtnam, Polk and Billy Burke to get information, which he believed Glass experienced as embarrassing and disheartening. Flipping also confirmed that the City administration was aware of Snellbaker's treatment of Glass and did nothing.  Until he resigned as Director of Public Safety in late April, 2004, Flipping had no contact with Glass and instead dealt with Glass' subordinates.

finding that Snellbaker's punishment of Plaintiff was motivated by evil motive or intent, or that it involved reckless or callous indifference to Plaintiff's federally protected rights of association.

### (b)  Quantum of Punitive Damages

The Court shall also deny the motion for a new trial or judgment as a matter of law on the quantum of punitive damages awarded.  There was sufficient evidence that $75,000 is an award Snellbaker can afford and the circumstances indicate that the award was not governed by passion or prejudice.  This damage award was the smallest award of all the damage awards the jury returned and appeared to be a measured attempt to accommodate Snellbaker's genuine financial constraints.  It represents a small fraction of the compensatory damages awarded and does not offend any rule of proportionality between compensatory and punitive damages.

The parties stipulated to Snellbaker's income, assets, and liabilities.  The only uncertain number was the portion of Snellbaker's marital home that can be attributed to him. Assuming for the sake of argument that half of the value of Snellbaker's marital home were his own asset, the balance of his assets and liabilities on the date of trial would have been $140,500.

Apart from this assumption, it is undisputed that Snellbaker

has guaranteed retirement income of $96,000 per year and expenses totaling only $42,000, meaning that each year, whatever his net worth may be, it is augmented by $54,000 in discretionary income. Thus, the jury's calculation that Snellbaker can afford $75,000 in punitive damages was a reasonable one if payments are extended over time.  The jury was permitted to award a meaningful amount that would serve as punishment, by definition a figure that is more than a mere token or symbol.

The HOVIC case, which Defendant cites in support of this motion, did not create a 1% rule.  That products liability case, with a large punitive damage award, noted that even though the award was large, it was actually approximately only 1% of the Defendants' net worth, which, the court said, was within a typical range of awards rendered against billion-dollar corporations.  See Dunn v. HOVIC, 1 F.3d 1371, 1384 (3d Cir. 1993).  That observation does not compel this Court to overturn any punitive damage award that exceeds 1% of a defendant's net worth, where the punitive award is significantly less than the compensatory damages and lies within defendant's ability to pay.

The Court notes also that the challenged punitive damage award is approximately half the nearly $140,000 in back pay that Plaintiff will retain.  Cf. Exxon Shipping Co. v. Baker, 128 S. Ct. 2605, 2633 (2008) (approving 1:1 ratio of compensatory to punitive damages as an upper limit in certain maritime cases).

Objectively, the award is not excessive.

In determining the $75,000 punitive damage award, the jury properly took into consideration Snellbaker's ability to pay and weighed the evidence, about which there was no dispute, of his guaranteed income and net worth.  The jury was instructed consistent with the Third Circuit's law on punitive damages and there is no indication that the jury failed to follow that instruction.  The instruction, as noted above (see n. 5), also instructed the jury that the award shall not have a purpose of deterring Snellbaker from such future misconduct, because he is retired.  The brevity of the jury's deliberations on the quantum of damages[7] does not indicate that the jury was biased, given that all assets and liabilities were stipulated, that these figures were not complex, and that the jury had already determined liability for punitive damages in the first phase of trial.

The jury also heard evidence that Snellbaker himself had been a victim of similar treatment during his rise through the ranks and had recovered a very substantial settlement from the City of Atlantic City as a result; the jury could determine that

---

[7]  Deliberations of just twenty-seven minutes on the punitive damages phase were not unduly brief, given that the jury had deliberated at length on the issues of liability and compensatory damages, and that the evidentiary presentation in the final punitive damages phase regarding quantum was itself only a few minutes.

one on the receiving end of such mistreatment within the Police
Department hierarchy would be especially attuned to the damage he
would cause to Deputy Chief Glass through the retaliatory
transfer and shunning at the peak of Glass's professional career.
For the reasons explained above, the punitive damages award does
not "shock the conscience" or otherwise merit remittitur.  Also,
as discussed above, there was no evidence that Snellbaker ever
asked for or obtained advice that it was legal for him to punish
Glass for associating with the union.  Rather, the only guidance
he sought was whether any other City employee had authority to
overturn his personnel decisions.  None did, so he was free to
act with impunity.

    For all these reasons, the Court shall not disturb the
$75,000 punitive damage award against Defendant Snellbaker.

## V.    PROPRIETY OF ECONOMIC DAMAGES

### A.    Post-Resignation Damages under 42 U.S.C. § 1983 in Absence of Constructive Discharge Claim

    The jury in this case was instructed that it had to
determine whether Plaintiff's resignation from employment was
voluntary before addressing his entitlement to damages for lost
wages and benefits:

> Plaintiff has the burden to show that his
> retirement was involuntary and was a product
> of the unlawful transfer and subsequent
> adverse treatment.  If his retirement was
> voluntary, then he has not demonstrated any
> loss of wages or benefits.  If on the other
> hand you are satisfied that his retirement was

31

> caused by the adverse employment action, then
> you must determine the amount of his past lost
> wages and benefits (accruing from December 31,
> 2005 to the present date), and also whether he
> is reasonably certain to suffer such loss of
> wages and benefits in the future.

(Jury Instr. 16, Compensatory damages) (Docket Item 72).

Atlantic City argues now that Plaintiff was not entitled to

seek damages for lost pay and benefits after his resignation

because he failed to plead a constructive discharge claim.[8]

Snellbaker argues that the Court should set aside the award of

compensatory damages for lost wages and benefits after December

_____

[8] Citing a non-precedential decision of the Third Circuit,
the City argues that Plaintiff had to overcome at trial a
rebuttable presumption that his resignation was voluntary,
Perisco v. City of Jersey City, No. 02-3061, 67 Fed. Appx. 669
(3d Cir. Apr. 29, 2003).  Of course non-precedential decisions
are not binding on this Court, but Perisco is also unpersuasive
in this case because it involved a single, allegedly retaliatory
incident.  Here, Plaintiff alleged at trial not only that he was
transferred in retaliation for his exercise of First Amendment
rights of association, but that he suffered continued
mistreatment and humiliation thereafter in further retaliation,
which ultimately compelled his involuntary decision to resign.
As Perisco's conditions of employment did not allegedly change
after the single incident, the Perisco decision noted that there
was no evidence Perisco's resignation was involuntary.  In light
of that lack of evidence, and because Perisco retired after
thirty years of service with full benefits, the Court presumed
the resignation was voluntary.
    In this case, Plaintiff was required to prove by a
preponderance of the evidence that his resignation was
involuntary as a result of Defendants' adverse employment action
(see Jury Verdict Form, Question 5, reproduced in Appendix),
which he did.  In addition to other contrasts with Perisco, this
case presented evidence that Plaintiff's resignation decreased
health benefits for him and his wife, who was quite ill at the
time, and that Plaintiff incurred significant out-of-pocket costs
as a result.

31, 2005, the date of Plaintiff's retirement. (Snellbaker Br. at 9.)[9]

Plaintiff opposes, arguing that Atlantic City failed to object to Plaintiff's request for this category of damages in the joint final pretrial order and that, in any event, he is not required to plead a claim for constructive discharge to collect pay for the period dating from his resignation to the date of the judgment (back pay), or thereafter (front pay).[10]

_____

[9] The City further argues, somewhat surprisingly, that it cannot be liable for Snellbaker's adverse treatment of Plaintiff after the transfer because Snellbaker was not the City's policymaker for that conduct. The parties stipulated at trial that "Chief Snellbaker was the policymaker for Atlantic City on personnel matters such as transfers," and the jury was so instructed, without objection. The City cannot, at this date, argue that Snellbaker was not a policymaker for purposes of imposing liability under 42 U.S.C. § 1983. The evidence at trial thoroughly aired not only the circumstances of Plaintiff's transfer, but also his mistreatment thereafter at the hands of Chief Snellbaker, who was the City's policymaker for managing Police Department personnel.

[10] "Back pay" refers to the pay Plaintiff would have received if he had been working from January 1, 2006 to the date of the judgment, January 30, 2008. "Front pay" refers to the pay plaintiff would have received from the date of judgment in this case until he would have retired, allegedly December 2010.
    The law is unclear in the Third Circuit whether back pay is an equitable issue for the Court. Compare Laskaris v. Thornburgh, 733 F.2d 260, 263 (3d Cir. 1984) ("[A]lthough the request for back pay under section 1983 seeks only equitable relief . . . , a claim for compensatory and punitive damages is a legal claim entitling the plaintiff to a jury trial.") and Savarese v. Agriss, 883 F.2d 1194, 1206 (3d Cir. 1989) (vacating and remanding for a redetermination of back pay by judge) with Squires v. Bonser, 54 F.3d 168, 176 (3d Cir. 1995) (assuming jury would determine back pay).
    If the availability of back pay is an equitable issue for

33

Although the City of Atlantic City has previously argued that the claim for constructive discharge was not supported by the evidence and should not be presented to the jury, to date no party has explained to the Court what legal basis it would have for denying the jury the ability to determine whether lost wages and benefits were consequential damages properly compensating Plaintiff for the harm inflicted on him by Defendants. The Court cannot grant this motion under Rule 50(a) given that Defendants failed to identify the legal basis for barring this claim prior to the submission of the claim to the jury. "A motion for judgment as a matter of law . . . made at any time before the case is submitted to the jury . . . must specify the judgment sought and the law and facts that entitle the movant to judgment." Fed. R. Civ. P. 50(a)(2). Because Defendants failed to identify the law that entitled them to judgment as a matter of

---

the Court, the Court would find that it is appropriate in this case. Plaintiff proved to the jury that he was forced out of his employment by the retaliatory harassment and daily humiliation he suffered at Defendants' hands and provided sufficient evidence of lost wages and benefits prior to trial in the amount awarded by the jury. Without repeating all the evidence, the Court finds Plaintiff has indeed demonstrated that the unlawful retaliation continued throughout his remaining time on the job, that this professional and personal humiliation became unbearable, and that his resignation was involuntary in light of his plans and intentions of remaining in the Police Department until retirement in 2010. Reinstatement is out of the question (Plaintiff does not seek it, the City has not argued for it as a remedy, and it would be all but impossible since the Deputy Chief position from which he was transferred was filled long ago). The appropriate equitable remedy would thus be an award of back pay, rather than reinstatement, equal to the amount of his proved economic loss.

34

law on the claim for lost wages and benefits, they waived their ability to make this argument after the verdict.  "A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence."  Fed. R. Civ. P. 50(b) advisory committee's note (1963).  This standard was reinforced in 1991:

> Paragraph (a)(2) retains the requirement that a motion for judgment be made prior to the close of the trial, subject to renewal after a jury verdict has been rendered. The purpose of this requirement is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment. Cf. Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342 (9th Cir. 1986) ("If the moving party is then permitted to make a later attack on the evidence through a motion for judgment notwithstanding the verdict or an appeal, the opposing party may be prejudiced by having lost the opportunity to present additional evidence before the case was submitted to the jury"); Benson v. Allphin, 786 F.2d 268 (7th Cir. 1986) ("the motion for directed verdict at the close of all the evidence provides the nonmovant an opportunity to do what he can to remedy the deficiencies in his case . . ."); McLaughlin v. The Fellows Gear Shaper Co., 4 F.R. Serv. 3d 607 (3d Cir. 1986) (per Adams, J., dissenting: "This Rule serves important practical purposes in ensuring that neither party is precluded from presenting the most persuasive case possible and in preventing unfair surprise after a matter has been submitted to the jury"). At one time, this requirement was held to be of constitutional stature, being compelled by the Seventh Amendment. Cf. Slocum v New York Insurance Co., 228 U.S. 364 (1913). But cf. Baltimore & Carolina Line v. Redman, 295 U.S. 654 (1935).

35

> The second sentence of paragraph (a)(2)
> does impose a requirement that the moving
> party articulate the basis on which a judgment
> as a matter of law might be rendered. The
> articulation is necessary to achieve the
> purpose of the requirement that the motion be
> made before the case is submitted to the jury,
> so that the responding party may seek to
> correct any overlooked deficiencies in the
> proof.

Fed. R. Civ. P. 50(a)(2) advisory committee's note (1991).

Consistent with these rules, the Court shall not permit Defendants to attempt a complicated argument about the applicability of Title VII case precedents to First Amendment claims brought pursuant to § 1983 at this stage.[11]  That issue

---

[11]  Whether Plaintiff is entitled to this category of damages is a complicated issue and an unsettled area of the law that the Court shall not reach out to decide without fulsome and timely arguments from the parties. Although not addressed by the parties, there is a split in the Circuits regarding whether Title VII Plaintiffs who have not proved the elements of a constructive discharge claim can nevertheless recover back pay when they quit after a proven discriminatory adverse action was taken against them.  See Townsend v. Exchange Ins. Co., 196 F. Supp. 2d 300, 308-10 (W.D.N.Y. 2002) (discussing cases); see also Tse v. UBS Financial Services, Inc., Civ. No. 03-6234(GBS), ___ F. Supp. 2d __, 2008 WL 463719, at *16 (S.D.N.Y. Feb. 19, 2008) ("The prevailing view of the appellate courts that have addressed the issue is that 'in order for an employee to recover back pay for lost wages beyond the date of his [employment], the evidence must establish that the employer constructively discharged the employee.' Jurgens v. EEOC, 903 F.2d 386, 389 (5th Cir. 1990)." (citing decisions of Fifth, Eighth and Tenth Circuits)).  In 1997, the Third Circuit Court of Appeals recognized the split and that it had not yet taken a position in the debate in Title VII cases.  See EEOC v. L.B. Foster Co., 123 F.3d 746, 756 (3d Cir. 1997).

The Third Circuit now appears to disfavor such an award of back pay and front pay absent proof of a constructive discharge claim, in Title VII hostile work environment cases. "[A]

was not raised prior to submitting the case to the jury and
Defendants did not object to the simple and clear instruction to
the jury to determine whether Plaintiff's resignation was

---

successful hostile work environment claim alone, without a
successful constructive discharge claim, is insufficient to
support a back pay award.  Put simply, if a hostile work
environment does not rise to the level where one is forced to
abandon the job, loss of pay is not an issue."  Spencer v. Wal-
Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006), cert.
denied, 127 S. Ct. 2985, 168 L. Ed. 2d 720 (June 18, 2007).  In
the Title VII context,

> Constructive      discharge    occurs    when     an
> 'employer  knowingly  permit[s]  conditions  of
> discrimination  in  employment  so  intolerable
> that a reasonable person subject to them would
> resign.'  Goss v. Exxon Office Sys. Co., 747
> F.2d 885, 887 (3d Cir. 1984). . .  'To prove
> constructive  discharge,  the  plaintiff  must
> demonstrate     a     greater    severity    or
> pervasiveness of harassment than the minimum
> required    to    prove    a    hostile    working
> environment.'  Landgraf v. USI Film Prods., 968
> F.2d 427, 430 (5th Cir. 1992), aff'd, 511 U.S.
> 244.

Id. at n.4.  "'[I]ntolerability . . . is assessed by the
objective standard of whether a reasonable person in the
employee's position would have felt compelled to resign,'--that
is, whether he would have had no choice but to resign."
Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998)
(quoting Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th
Cir. 1996)).
    A recent non-precedential decision from the Third Circuit
held that a Title VII plaintiff whose treatment does not reach
this threshold "probably" cannot seek back pay or front pay.
Hare v. Potter, No. 05-5238, 220 Fed. Appx. 120, 135 (3d Cir.
Mar. 21, 2007).  However, in that case the Court had determined
as a matter of law that no reasonable jury could find Plaintiff
was constructively discharged.  Id.  No such finding was made in
this case; in fact, the jury found that Plaintiff proved his
resignation was involuntary due to the actionable conduct of
Snellbaker and the City.

voluntary.  It was not clear error, in these circumstances and in the absence of objection, to have instructed the jury on involuntary resignation caused by Defendants' conduct, without labeling this circumstance as a "constructive discharge" in the instructions.  The jury having found that the resignation was not voluntary and that it was a result of Defendants' violation of Plaintiff's constitutional rights, and the Court finding there was ample evidence from which the jury very likely would have found constructive discharge had it been explicitly outlined in the instructions, the Court shall deny the motion for judgment as a matter of law on Plaintiff's damages for back pay, that is lost wages and benefits from the date of resignation to the date of judgment.

Further, this case is not a Title VII case, but a case for violation of First Amendment rights of association brought pursuant to 42 U.S.C. § 1983.  The jury was charged with determining whether "Plaintiff proved that his retirement was involuntary as a result of Defendants' adverse employment action,"[12] and was given evidence that Plaintiff retired on account of the mistreatment he suffered everyday subsequent to his transfer.  There was no objection to the back pay and front pay instructions.  Defendants cross-examined Plaintiff extensively about whether he left his employment for personal

_____

[12] Jury Verdict Form, Question 5 (Appendix hereto).

38

reasons or because of the harassment and mistreatment he was suffering at work at the hands of Chief Snellbaker, and whether his normal expected retirement would have been sooner than the fives years Glass claimed.  Faced with this evidence, the jury determined, by a preponderance of the evidence, that Plaintiff's resignation was not voluntary and that it was caused by Defendants' retaliation for exercising his First Amendment associational rights.

Defendants have pointed the Court to no case law discussing the availability of lost wages to plaintiffs suing under 42 U.S.C. § 1983 who do not make or prove constructive discharge claims.  But see Hedrick v. Metro. Sch. Dist. of Lawrence Twp., No. 1:04-cv-0015-RLY-WTL, 2007 U.S. Dist. LEXIS 6661 (S.D. Ind. Jan. 26, 2007) (merely noting, without discussion, that plaintiff claiming denial of due process under § 1983, but not challenging propriety of discharge, could not seek back pay in light of Seventh Circuit's rule under Title VII).[13]

_____

[13]   The Title VII case law is not on point because it relies on the general purpose of Title VII, to encourage resolution of employment issues in place, that is, to encourage exhaustion of all remedies short of litigation.  Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 66 (5th Cir. 1980) ("society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships").  Prior to the Third Circuit's Spencer decision, a court in the Eastern District of Pennsylvania indicated, in a failure-to-promote case, that (1) courts should permit back pay up to the date that the employee would have held the job to which she should have been promoted absent discrimination and (2) the courts that restrict such

claims absent constructive discharge do so because Title VII
encourages solutions in the workplace where such possible
solutions exist, and that, therefore, compensatory wage claims
should be permitted where no such possible solutions exist.
Ezold v. Wolf, Block, Schorr and Solis-Cohen, 758 F. Supp. 303,
311 (E.D. Pa. 1991), rev'd on other grounds, 983 F.2d 509 (3d
Cir. 1992), cert. denied, 510 U.S. 826 (1993).  "Where such a
possibility can no longer be said to exist, back pay should not
be restricted where the motivation for resignation is the very
discrimination suffered and not some unrelated reason, even when
no constructive discharge took place."  Id. at 311 (emphasis
added).  Essentially this case recognized the general rule that a
plaintiff must prove constructive discharge in order to seek lost
pay under Title VII, but created an exception where there is
evidence (1) that the plaintiff left on account of the
discriminatory conduct and (2) there was no avenue available to
the employee to address that discrimination.  "The rationale
behind this rule is that 'society and the policies underlying
Title VII will be best served if, wherever possible, unlawful
discrimination is attacked within the context of existing
employment relationships.'"  EEOC v. L.B. Foster Co., 123 F.3d at
755 (quoting Ezold, 758 F. Supp. at 307).

Title VII thus serves the purpose of fostering
reconciliation through means of restoration of employment or
other equitable remedies, while Section 1983 provides a broader
range of legal remedies, unconstrained by requirements to exhaust
available remedies before seeking judicial relief.  Further, as
is apparent, the redress of violation of First Amendment rights
arising under Section 1983 has no analog in Title VII, which is
designed to redress discrimination in employment due to personal
characteristics such as race and gender.  No reason is apparent,
and Defendants in this case have suggested none, why Title VII's
unique mechanisms and policy choices regarding remedies for
workplace discrimination should be imported into this case under
Section 1983 redressing violation of First Amendment rights
through continued retaliation.

In sum, Title VII authority does not bar the claim for lost
wages and benefits in this case for two reasons: (1) unlike Title
VII, 42 U.S.C. § 1983 does not create a complex administrative
scheme that encourages resolution of disputes in place and
therefore the same policy concerns do not apply; and (2) even if
42 U.S.C. § 1983 did incorporate the same policy concerns, in
this case Plaintiff provided evidence that he "had no choice but
to resign," see Connors, 160 F.3d at 976 and the jury determined,
when instructed without objection, that his resignation was not
voluntary.  In the Title VII cases that limit recovery, in

Indeed, there is ample evidence that Plaintiff had no choice but to resign.  Although Plaintiff was questioned about whether other options were available, there was no evidence from any witness that such options existed and were viable avenues for reversing the Chief's illegal decisions.  There was evidence that only Director Flipping or the Mayor could have corrected the Chief's illegal conduct, that they were aware of it, and that they were unwilling or unable to do anything about it.  Plaintiff testified that he spoke with Director Flipping about his transfer "a number of times." (Glass Tr. Jan. 28, 2008 at 80:13-15, Ex. C to Williams Cert.)  Plaintiff conceded that the PBA represented him but testified that he didn't file a grievance with the PBA because it would have to go to through the Chief. (<u>Id.</u> at 80:16-24.)  However, Plaintiff also testified that after a grievance goes to the Chief, it "goes to the Business Administrator or Director of Public Safety and the Mayor." (<u>Id.</u> at 80:24 to 81:1.)  Plaintiff explained why he filed no grievances:

> The reports and grievances would have gone to
> Chief Snellbaker, and I was aware that the

---

general there has been a finding that the terminations were not wrongful discharges, <u>see, e.g.</u>, <u>Less v. Nestle Co.</u>, 705 F. Supp. 110, 114 (W.D.N.Y. 1988) (granting summary judgment for defendant on constructive discharge because "plaintiff has failed as a matter of law to set forth any set of facts amounting to a *prima facie* case of constructive discharge."); <u>Tse v. UBS</u>, __ F. Supp. 2d ___, 2008 WL 463719, at *16 (S.D.N.Y. Feb. 19, 2008) (where jury specifically found that Plaintiff was not discriminatorily terminated, Plaintiff was not entitled to seek post-employment economic damages); there is no such finding here.

41

> administration already knew what was taking
> place, so that didn't make any sense.  I'm
> going to grieve my situation, my punishment,
> my transfer to the person that did it?  And
> the person – the people above him already knew
> about it and tried to stop it.  So my position
> was . . . what avenues do I have?  And I took
> the avenue of getting an attorney.

(Id. at 98:11-18.)  Plaintiff then provided evidence that
Flipping attempted to stop the transfer before it occurred but
was unable to do so.

Mayor Langford testified for the City that he didn't take
any action with regard to the transfer because he wasn't sure it
was within his authority to overturn the Chief's decision.
(Langford Tr., Jan. 29, 2008 at 9:5 to 10:15, Ex. G to Williams
Cert.)  Langford also testified that he became aware of
"rumblings" after the transfer, that Glass was in a "do-nothing
job [that was] retaliatory in nature," that this knowledge may
have come "directly from Deputy Chief Glass," and that the Mayor
believed them.  (Id. at 10:16-23.)

Thus, even if the Court were to permit the argument that
Title VII authority bars claims for back pay in cases under 42
U.S.C. § 1983 absent constructive discharge claims, the Court
would deny that argument on the merits in this case because of
the inapplicability of Title VII policies to Section 1983 in the
circumstances of this First Amendment retaliation case and,
alternatively, because there was ample evidence that Plaintiff

42

had no choice but to resign and the jury found the resignation to be involuntary as a result of Defendants' adverse employment action.

In addition, the Defendants waived this argument about Title VII by failing to articulate, in the Rule 50(a) motion at the close of the evidence, the legal basis for how judgment as a matter of law might be rendered, as the rule requires. "A motion for judgment as a matter of law rendered after trial must be made on grounds that were previously asserted in a motion for directed verdict prior to submission of the case to the jury." Mosley v. Wilson, 102 F.3d 85, 90 (3d Cir. 1996).

Here, Defendants raised the propriety of the economic damages sought at the close of Plaintiff's case, but espoused only "a number of issues" that "could" result from his allegedly wrongful pursuit of the damages: "waiver," "his ability to grieve, complain, seek recourse . . ., collateral estoppel, entire controversy doctrine." (Rule 50(a) H'rg at 58:15-22.) Counsel further argued that "He can't sit back and watch and wait, he has an obligation to bring forth the claim." (Id. at 58:22-24.) Defendants cited no cases or any other legal authority to support an argument that claims for damages under 42 U.S.C. § 1983 are sufficiently similar to those under Title VII such that the Court should preclude post-employment lost wages damages in the absence of a claim for constructive discharge.

43

Had Defendants raised this argument during trial, cited any of the cases the Court has cited in this Opinion, indicated that this was a legal issue rather than a factual issue of causation – which the Court determined was for the jury — or timely objected to the jury charge, the Court could have instructed the jury on the elements of constructive discharge, if necessary.  There was certainly evidence in the case from which a reasonable jury could determine that Plaintiff was constructively discharged and when the jury was instructed that it must determine whether the resignation was not voluntary, and whether it was caused by Defendants' conduct toward Plaintiff, Defendants raised no objection.

Instead, Defendants merely pointed to the length of time between Plaintiff's transfer and his resignation and argued that the connection was tenuous.  In rendering its decision on the initial Rule 50(a) motion, the causation issue was left to the jury.  When Defendants raised a second Rule 50(a) motion at the close of all the evidence, Defendants did not even mention the issue of whether Plaintiff was entitled to economic damages. While there is no need to move twice before the verdict, here Defendants failed to argue in either instance that the law barred this class of damages.

Indeed, the parties agreed to instruct the jury that it must determine whether Plaintiff had proved that his departure from

44

employment was not voluntary.  There was no objection to the
agreed-upon charge or to the jury interrogatory about this issue
on the Jury Verdict Form and the jury determined that the
departure was not voluntary.  It would be unfair at this point to
permit Defendants to eliminate this category of damages – to
which Plaintiff proved he was entitled – on the basis of an
argument Defendants could have raised before or during the trial
but did not.

Accordingly, the Court shall deny the motion for judgment
notwithstanding the verdict on Plaintiff's claim for back pay.
The award of $136,400 for past wages and benefits from December
31, 2005 to the date of the verdict shall stand.[14]  Plaintiff
proved to the jury, by a preponderance of the evidence, that
Defendants retaliated against him for exercising his First
Amendment right of association, that such retaliation played a
substantial role in his decision to resign, and that he did not
leave employment voluntarily.  In other words, the Court cannot
grant the motion for judgment as a matter of law because it
cannot say that "there is insufficient evidence from which a jury
reasonably could find liability," for those lost wages and

---

[14]   Nor shall the Court remit the back pay award.  The
amount of $136,400 covers the period of 25 months of back pay
from December 31, 2005 through January 30, 2008.   The
Plaintiff's testimony showed annual loss of wages and benefits of
$67,200, which is $5,600 per month.  The amount awarded is
slightly less than the product of 25 months at $5,600 per month,
which is $140,000.

benefits.  See Wittekamp v. Gulf & W., Inc., 991 F.2d 1137, 1141 (3d Cir. 1993) (stating this standard).  Therefore, the Court shall deny the motion for judgment as a matter of law as to the award of back pay.[15]

Similarly, there is no legal infirmity barring front pay as a matter of law.  However, the Court will address below the quantum of front pay damages awarded by the jury.

**B.   Remittitur of Front Pay**

Atlantic City argues separately that it is entitled to a new trial or remittitur on the economic damages award because the jury erred in allegedly overlapping the awards of front and back pay, as it awarded Plaintiff more front pay than he requested and the evidence does not support the jury's calculation of front pay damages.  Plaintiff concedes that the jury erred in calculating the front pay award, but argues that the Court should mold the judgment to conform to the full measure of damages requested by

---

[15]  Although the Court has more discretion to grant a motion for a new trial on this claim, the Court shall decline to do so. The verdict is not against the weight of evidence and is not otherwise unfair.  In the absence of objection to the Court's jury instructions and jury interrogatories regarding causation, involuntary retirement and lost wages, a new trial should not be ordered unless the verdict is contrary to the great weight of the evidence or the trial was unfair, see Part III. B., supra.  The Court does not find that any error in the jury instructions was substantial, given the jury's determination that Plaintiff left Atlantic City's employ on account of his mistreatment by Snellbaker through the transfer decision and continuing after the transfer and that his retirement was involuntary as a result. The Court shall address the propriety of the front pay damages below.

him at trial, pursuant to Fed. R. Civ. P. 59(e).  Plaintiff further argues that remittitur is inappropriate.

The standards for remittitur are set forth in Part III.C, supra.  Because the jury separately determined back pay and front pay and there was nothing inappropriate about the back pay award, there is no need for a new trial on the basis of the infirmities in the front pay award.  Cf. Savarese, 883 F.2d at 1206 (remanding for redetermination of overlapping damages where jury did not separately determine front and back pay).[16]

However, the jury erred in awarding Plaintiff $409,600 in future lost wages and benefits rather than a sum not greater than the $196,000 for which he provided evidence.  The jury's front pay award exceeds any reasonable view of the evidence.  The period of front pay loss sought in this case was from the conclusion of trial on January 31, 2008 until Plaintiff's intended retirement date of December 31, 2010 at age 62. Plaintiff's evidence of wage and benefits loss, as described above, was $67,200 per year.  His testimony about wage and benefit loss and expected retirement date was credible and

---

[16]  Atlantic City also argues that Bereda v. Pickering Creek Indus. Park, Inc., 865 F.2d 49 (3d Cir. 1989) requires a new trial when the jury miscalculates a damage award. (Atl. City Reply Br. at 3.)  Bereda does not stand for such a general proposition.  Rather, on the facts of that Title VII case, the Court found that a new trial was warranted because a jury, which heard the case by consent, was not instructed on the statutory cap for wage loss under Title VII.  This case does not present that issue.

47

consistent and supports a verdict for future wage loss.  The proven economic loss was thus $5,600 per month.  When extended over a period of 35 months to December 31, 2010, the evidence supports a future economic damage award of $196,000.

Because the present front pay award of $409,600 is "unsupported and/or excessive," see Spence, 806 F.2d at 1201, the Court shall order remittitur of that award to $196,000, the amount proven at trial.  It is clear that the jury sought to provide Plaintiff at least as much economic compensation as he requested, and the evidence supports an award of no more than $196,000.  Other than disputing whether Plaintiff's resignation was truly voluntary and caused by Defendants' retaliation, Defendants provided no alternate theory of Plaintiff's future lost wages and benefits, nor any reasonable argument for a further reduced amount.  Further, as noted above, the post-trial equitable remedy of reinstatement was not sought by Plaintiff or suggested as an alternative by Defendants, nor has any party suggested that the reinstatement of Glass to his former position as Deputy Chief in charge of the Special Operations Division is feasible.  Thus, the appropriate measure of front pay is damages, and the appropriate figure is a verdict that is reduced to $196,000.

If Plaintiff objects to remittitur, there shall be a new trial on the issue of front pay.

48

## VI.   EFFECT OF DISMISSING COUNT TWO

Atlantic City moves for a new trial alleging that evidence relating to a dismissed state law claim tainted the trial's fairness.  At the close of Plaintiff's case, the Court dismissed a state law claim made by Plaintiff.  The original basis for asserting that claim was unclear – it was purportedly either a common law wrongful discharge claim pursuant to Pierce v. Ortho Pharm. Corp., 84 N.J. 58 (1980) or a statutory claim pursuant to N.J. Stat. Ann. § 40A:14-147, as articulated in advance of trial. The Court, after discussions with counsel, defined this state cause of action in its preliminary instructions to the jury as arising under § 40A:14-147, which prohibits reduction in rank or position of a police officer without just cause.  This claim was dismissed at the close of Plaintiff's case pursuant to Rule 50(a), Fed. R. Civ. P., since Plaintiff failed to adduce evidence that he suffered a reduction "in rank from or in office, employment or position therein," within the meaning of the statute.  At most, the Court held in its oral opinion of January 29, 2008, the evidence showed a functional demotion to a do-nothing job, but not a reduction in rank or position as those terms are used in the statute.

The City argues that it is entitled to a new trial because the jury was improperly exposed to evidence that Defendants failed to follow proper termination or transfer procedures prior

to Plaintiff's transfer.

A jury's exposure to inadmissible evidence requires a new trial, "unless it was 'highly probable' that the error did not affect any 'substantial rights.' " Bhaya v. Westinghouse Electric Corp., 922 F.2d 184, 189 (3d Cir. 1990)(quoting McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985)). However, in this case, evidence that Plaintiff was not transferred according to normal policies and procedures was also relevant to Count One, his claim that he was transferred for exercising First Amendment rights rather than on account of any misconduct.  Therefore such evidence was not "inadmissible" evidence.  Moreover, evidence admissible for a claim that is subsequently dismissed does not thereby become inadmissible or otherwise prejudicial; no party sought a limiting instruction on this point when the scant evidence of a statutory violation was received, nor did any party seek an order striking any such testimony after Count Two was dismissed when Plaintiff rested. The fact that Snellbaker and the City did not use the procedures available for disciplining wrongdoing was relevant to their awareness that Plaintiff had, in fact, not done anything worthy of discipline and was admissible to prove that fact, which is relevant to his First Amendment claim.  Certainly Plaintiff's counsel did not argue, in her summation, that Defendants committed the statutory violation alleged in Count Two.

In addition, the City does not point to any specific evidence that was admitted at trial but should not have been and that likely affected its rights to be tried only on evidence relevant to Count One.  Defendants have not met their burden of showing that evidence solely relevant to the dismissed Count Two prejudiced Defendants' rights to a fair trial on Count One.

In the absence of any claim that inadmissible evidence harmed Defendants' rights, the Court must deny the motion for a new trial on account of the Court's decision to dismiss Plaintiff's state law claim.

## VII. DAMAGES FOR EMOTIONAL DISTRESS

Atlantic City argues that the award of $250,000 for mental distress is not supported by the evidence admitted at trial and that the Court must, therefore, eliminate it or substantially reduce it.  Plaintiff argues that there was sufficient evidence at trial to support the $250,000 award.

"In § 1983 actions, damages for violations of constitutional rights 'may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation . . ., personal humiliation, and mental anguish and suffering.'"  Pryer v. C.O. 3 Slavic, 251 F.3d 448, 454 (3d Cir. 2001) (quoting Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986)).  However, a Plaintiff may not recover compensatory damages for such injury, "without proof that such

injury actually was caused." <u>Carey v. Piphus</u>, 435 U.S. 247, 264 (1978).

The standards governing remittitur are discussed above at Part III.C.  For the reasons next discussed, the Court concludes on the facts and circumstances in this case that Plaintiff presented evidence of actual emotional injury, but that the $250,000 award is so excessive as to shock the conscience.  It is appropriate to reduce the compensatory damage award for emotional distress to $50,000, the maximum recovery that does not shock the judicial conscience.  <u>See</u> <u>Evans v. Port Auth. of N.Y. & N.J.</u>, 273 F.3d 346, 355 (3d Cir. 2001) ("remittitur should be set at the 'maximum recovery that does not shock the judicial conscience'") (quoting <u>Gumbs v. Pueblo Int'l, Inc.</u>, 823 F.2d 768, 774 (3d Cir. 1987)).  Plaintiff presented his testimony about the emotional effects of the transfer and mistreatment on him.  The jury reasonably found from this evidence that he suffered actual emotional injury at the hands of Defendants, in retaliation for his protected activity under the First Amendment.

Plaintiff testified that the constitutional violation caused emotional injury, but the manifestations of that injury do not appear to have been severe.  Although he reported feeling humiliated and emotionally devastated, he continued coming to work just as before and reported no changes in sleep or other emotional effects.  He also did not suffer financial stress at

that time, as his salary and benefits continued as long as he remained on the job.  His damage to professional pride was hurtful, but is difficult to measure as actual damages. Plaintiff sought no counseling or other mental health treatment and no family member or coworkers testified about the emotional impact that Defendants' conduct had on him.  The Court recognizes that no specific type evidence (such as expert medical or psychological testimony) is required to show mental or emotional harm, Bolden v. SEPTA, 21 F.3d 29, 34 (3d Cir. 1994), but "[t]here must be a rational relationship between the specific injury sustained and the amount awarded," Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 774 (3d Cir. 1987).

Plaintiff did not testify that he has suffered any lasting emotional distress or other non-economic injury since his retirement.  "A remittitur is in order when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole, i.e., to remedy the effect of the employer's [unlawful conduct]." Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1100 (3d Cir. 1995).  Without any ongoing emotional injury, the compensation awarded should compensate only for the years the distress was suffered, that is, the years of employment post-transfer.

Plaintiff's wife did not testify to her observations of

53

emotional harm.  Plaintiff's evidence of emotional distress came
exclusively from his own testimony.  When asked about his
emotional response to the retaliatory transfer, Glass testified
on direct as follows:

> Q:  And how did you feel about the transfer?
> A:  I thought it was an absolute punishment.  It
>     was done to hurt me.  And I thought it was
>     evil because [Snellbaker] thought it was
>     funny.   It was not funny. . .. Chief
>     Snellbaker froze me out of the police
>     department and ostracized me and humiliated me
>     every single day.

(Glass Tr. 43:18-21.)  Plaintiff also testified that Snellbaker
told others he could not be trusted. His attorney asked him, "How
did that make you feel or what kind of reaction did you have to
that?"  (Id. at 49:6-7.)  Plaintiff answered,

> Actually I felt sorry for Chief Snellbaker.  He had
> become the emperor with no clothes on.  Every time
> that I spoke to him, he got my best advice.

(Id. at 49:8-10.)  Feeling "sorry for Chief Snellbaker" is not an
expected reaction if Glass suffered emotional devastation.  The
evidence here did not show the type of devastation that could
support a $250,000 verdict.

Plaintiff was fairly stoic during his testimony and did not
display an emotional response to recounting these events five
years later at trial.  Counsel again sought to elicit Plaintiff's
expression of his emotional distress.

> Q:  Were you happy about your transfer?

54

        A:    I was not.

(Id. at 49:16-17.)   There was no testimony about any emotional

effects he has today from this past unconstitutional treatment.

Indeed, there was no testimony that his distress continued after

he resigned, so this mental or emotional harm was not shown to

continue beyond the end of 2005.

    Plaintiff testified that after the transfer his work

attendance did not change and that he showed up for work every

day and continued to work a 40-hour workweek. But he also

explained that hard work was essential to his sense of identity

and ethical responsibility (Glass Tr. at 57:8-21), and that he

felt like a helpless pariah when Snellbaker told others he could

not be trusted:

            Glass:    It was emotionally devastating, and I
                      experienced that embarrassment every
                      single day.   Men who worked for me
                      couldn't look at me, and I started to
                      have problems looking at them because it
                      had gotten back to me that you're not
                      trustworthy.
            Q:        How did that make you feel?
            A:        Maybe I can use an example of how it made
                      me feel. . . You're the vice-principal of
                      a school, the principal tells the
                      teachers that work for you that you're a
                      pedophile.   Then he takes your duties
                      away and puts you in a room, just stay
                      there.   And then he goes directly to
                      those teachers.   Never calls you in.
                      Never tells you anything about it.   It's
                      just that's what he's telling them, you
                      can't be trusted.  How do you supervise?
                      What do you do?   How do you feel about
                      yourself in a career that you dedicated
                      your life?

(Id. at 58:9 to 60:14.)

Plaintiff also testified that his doctor prescribed him additional medication to control his pre-existing high blood pressure and told him that his elevated blood pressure was related to stress.  (Id. at 65:22 to 66:4.)  However, Plaintiff admitted that his wife was suffering from esophageal cancer at the time, a potential additional stressor.  (Id. at 65:2-7.)

His reputation in the Department did not suffer, despite Snellbaker's disparagement.  On cross-examination, Plaintiff conceded that the other deputy chiefs respected and trusted him enough after the transfer to ask him to represent them in their contract negotiations with the City.  (Id. at 94:3-10, 95:4-6.) Similarly, all of Plaintiff's witnesses, as well as defense witness Mayor Langford, testified that Plaintiff had an excellent reputation in the Department and that they did not attribute his transfer to untrustworthiness on his part.

The evidence of Plaintiff's emotional distress was comprised of his testimony alone.  Cf. Evans, 273 F.3d at 355.  Plaintiff displayed little emotional affect on the stand, but recalled feeling emotionally devastated by Defendants' unconstitutional conduct and that it had seemed to increase his stress level.  The evidence clearly supports his testimony that he was humiliated by Snellbaker's treatment for two years and that he could not bear it to continue, so he retired.  The appropriate measure of his

56

emotional pain and suffering arises from that two-year period of mistreatment.  He suffers no lasting harm, physically or emotionally, and there was significant evidence that there was no harm to Plaintiff's reputation, although he certainly felt humiliated as he dramatically explained by analogy.

Plaintiff also explained how work was integral to his identity and purpose and life and how alone and upset he felt when he was thwarted from that purpose by the "evil" actions of his Chief of Police.  A Defendant's conduct motivated by malicious intentions may be addressed, as in this case, by punitive damages.  Compensatory damages, on the other hand, are confined to the actual injury suffered, and not by the intent of the Defendant.

As required by law, Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 773 (3d Cir. 1987), the Court has examined precedents to identify verdicts for comparable emotional harm in Section 1983 cases not arising in the context of discrimination.  In those cases that resulted in awards for non-economic damages much in excess of $50,000, the plaintiff suffered prolonged physical symptoms, Phillips v. Bowen, 278 F.3d 103, 111 (2d Cir. 2002), or sought medical or psychological assistance, Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir. 1996).  In Phillips, the jury awarded $400,000 to an employee of a county sheriff after hearing evidence that the employee was ill in the bathroom for "two to

57

three hours every night" during the years that the county sheriff harassed her because of her opposition to his political campaign. 278 F.3d at 108, 111.  Similarly, in <u>Forsyth</u>, a police officer who was transferred from the intelligence unit to night patrol after exposing police misconduct won $100,000[17] for his emotional distress, as evidenced by his depression, weight loss, intestinal troubles, marital problems, and consultation with a psychologist. 91 F.3d at 772, 774.  Glass did not endure lasting physical symptoms due to Defendents' misconduct, nor did he seek treatment of any kind.

Rather, Plaintiff's suffering - his humiliation and forced isolation over two years – more closely resembles cases where the plaintiff endured less severe emotional harm and consequently the jury awards do not surpass $50,000.  Plaintiff's humiliation is comparable to a former police officer's feelings of inadequacy, embarrassment, stress, and suicidal thoughts when the former officer tried to compensate for his lost income after he was fired without due process, for which the officer received $12,000[18] as compensation for emotional harm.  <u>Miner v. City of Glen Falls</u>, 999 F.2d 655, 662 (2d Cir. 1993).  Nevertheless,

---

[17] According to the U.S. Bureau of Labor Statistics, this award is equal to $140,193.75 in current U.S. dollars. www.bls.gov/data/inflation_calculator.htm.

[18] Again, as calculated by the U.S. Bureau of Labor Statistics, this award is equal to $18,266.91 in current U.S. dollars.  www.bls.gov/data/inflation_calculator.htm.

Plaintiff's testimony about his daily humiliation, ostracism, and emotional distress over a two-year period, as a consequences of Defendants' retaliation for his exercising his First Amendment rights, and corroborated by Plaintiff's forced change in circumstances, is sufficient to justify a compensatory damage award of $50,000.[19]  See Matlock v. Barnes, 932 F.2d 658, 667 (7th Cir. 1991) ("[the jurors] could themselves arrive at an estimation of plaintiff's loss, by comparing the circumstances of [plaintiff's] life and work before and after his transfer").

A court should not lower a damage award if the evidence in the record supports it, see Evans, 273 F.3d at 348, but in this case remittitur is appropriate because $250,000 for such emotional suffering shocks the conscience.  The Court shall remit the award to $50,000, which is the highest amount supported by evidence, which does not shock the conscience, for suffering two years of ostracism, mistrust, and undermining of professional achievements in retaliation for exercise of First Amendment associational rights.  If Plaintiff does not accept this remittitur, there shall be a new trial on damages for emotional

---

[19] In this way, Plaintiff's evidence of emotional damages is distinguishable from the evidence presented in Spence v. Bd. of Educ., 806 F.2d 1198, 1201 (3d Cir. 1986), where the court of appeals affirmed the district court's remittitur of all compensatory damages for emotional distress.  Here, unlike in Spence, the award of compensatory damage is not "wholly speculative" but based on Plaintiff's testimony and evidence of his change in circumstances due to his reassignment.  See Spence, 806 F.2d at 1201.

59

distress.

## VIII. MOTION FOR STAY OF EXECUTION OF JUDGMENT AND WAIVER OF SUPERSEDEAS BOND

### A.   Atlantic City

Atlantic City moves, pursuant to Fed. R. Civ. P. 62(f), for a stay of the execution of the judgment against it and to waive the bond requirement pending disposition of this motion and any future appeals.  Plaintiff concedes the City is entitled to this relief.  Rule 62(f) provides: "If a judgment is a lien on the judgment debtor's property under the law of the state where the court is located, the judgment debtor is entitled to the same stay of execution the state court would give."  Under N.J. Court Rule 2:9-6(b),

> When an appeal is taken . . . by the State or any political subdivision thereof or any of their respective officers or agencies . . . and the operation or enforcement of a judgment or order is stayed, no bond, obligation or other security shall be required from the appellant.

A municipality or its police department "qualifies as one of the entities that is exempt from posting a bond to obtain the stay." Hurley v. Atlantic City Police Dep't, 944 F. Supp. 371, 373 (D.N.J. 1996).

### B.   Snellbaker

Snellbaker argues that he is an "officer" within the meaning of N.J. Court Rule 2:9-6(b) and that he is therefore also

60

entitled to such a stay.  <u>Hurley</u> declined to decide whether the word "officer" in N.J. Court Rule 2:9-6(b) refers only to high-ranking officials sued in their official capacities.  The Court instead looked at Fed. R. Civ. P. 62(d), which provides district courts with additional discretion to grant a stay on the judgment with or without a bond.

> Several factors can be used to determine whether the bond should be waived. The court may examine: (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place the other creditors of the defendant in an insecure position.

<u>Hurley</u>, 944 F. Supp. at 374.

Snellbaker argues that the Court should, in the alternative, grant the discretionary stay.  Snellbaker argues that Plaintiff's judgment is adequately protected because it is a lien upon Snellbaker's real and personal property; obtaining the bond would produce a financial hardship on him; Snellbaker has presented evidence that he can satisfy the judgment against him and that he will maintain the same degree of solvency through the appellate process.

Plaintiff has not argued about this discretionary bond.

61

Plaintiff merely argues, without reference to any law, that Plaintiff is a private citizen for whom bonds are required, absent good cause shown.

Because it appears appropriate under New Jersey law to grant the bond and stay requests by both Defendants, the Court shall do so.  All of Snellbaker's assets are in New Jersey and there is no argument that collection would be complex; an appeal may take a significant amount of time; the Court is confident there are sufficient funds to pay the $75,000 award and, therefore, a bond may be unnecessary.  On the other hand, there is no evidence that Snellbaker's financial situation is precarious; he could afford to pay the bond.  Nevertheless, the Court will exercise its discretion to grant Snellbaker's request to stay the bond requirement.

## IX.   CONCLUSION

For the foregoing reasons, the Court shall enter an order denying the motions for judgment as a matter of law and for a new trial as to the award of back pay; granting the motion for remittitur as to the awards for front pay and emotional distress; denying the motions for judgment as a matter of law and for a new trial as to the award of punitive damages against Snellbaker; denying the motion for a new trial on account of evidence related to Plaintiff's dismissed state law claim; and granting the motions to stay execution of judgment and for waivers of the

requirement to post supersedeas bonds pending appeal.

Plaintiff's recovery thus amounts to compensatory damages of

$382,400 (consisting of $50,000 for emotional harm, $136,400 in

back pay and benefits, and $196,000 in front pay and benefits)

against Defendants City of Atlantic City and Arthur C. Snellbaker

in his official capacity, and punitive damages in the amount of

$75,000 against Defendant Arthur C. Snellbaker, individually.

The accompanying Order and Amended Judgment is entered.



**September 17, 2008**                        **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              U.S. District Judge

63

**APPENDIX**

**JURY VERDICT FORM**

We, the unanimous Jury, find as follows:

Question 1:    Did Will Glass participate in the "Protected Activity" as that term is defined in the Court's Instructions?

   X    Yes               No

[If Yes, go to Question 2.
 If No, cease deliberations.]

Question 2:    Was Will Glass's transfer to the Support Services position an "adverse employment action" undertaken in order to punish him as that term is defined in the Court's instructions?

   X    Yes               No

[If Yes, go to Question 3.
 If No, cease deliberations.]

Question 3:    Was Will Glass's "Protected Activity" a motivating factor in Chief Snellbaker's decision to transfer Glass on or about April 14, 2003?

   X    Yes               No

[If Yes, go to Question 4.
 If No, cease deliberations.]

Question 4:    What is the amount of damages, if any, you award to fairly compensate Will Glass for emotional and mental harm he sustained as a result of Defendants' conduct?

$250,000

[Go to Question 5.]

Question 5:    Has Plaintiff proved that his retirement was involuntary as a result of Defendants' adverse employment action?

   X    Yes               No

64

[If Yes, go to Question 6.
 If No, go to Question 8.]

Question 6:   What is the amount of the loss of past wages and
              benefits Plaintiff has sustained as a result of
              Defendants' conduct, if any, from December 31,
              2005 until now, or for any part of this period?

                        $136,400

              [Go to Question 7.]

Question 7:   What is the amount of future loss of wages and
              benefits Plaintiff has shown he is reasonably
              certain to sustain, if any, as a result of
              Defendants' conduct?

                        $409,600

              [Go to Question 8.]


Question 8:   If you have returned a verdict for William Glass
              by answering Questions 1, 2 and 3 "Yes," but
              William Glass has failed to prove compensatory
              damages in Questions 4, 5, 6 and 7, then you will
              enter an award of nominal damages of $1.00 here,
              otherwise leave blank.

                    $

              [Go to Question 9.]

Question 9:   Should punitive damages be imposed against
              Defendant Arthur Snellbaker?

              __X__ Yes              _____ No

              [If Yes, do not indicate an amount]

65

**<u>SUPPLEMENTAL JURY VERDICT FORM</u>**

We, the unanimous Jury, find as follows:

<u>Question 10</u>:     What is the amount of punitive damages the Jury
finds in favor of William Glass and against Arthur
Snellbaker, Sr., individually?

<u>$75,000     </u>